[Crim. No. 21323. June 6, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
HAROLD RAY MEMRO, Defendant and Appellant.

662

664

COUNSEL

Jay L. Lichtman, under appointment by the Supreme Court, for Defendant and Appellant.

George Deukmejian and John K. Van de Kamp, Attorneys General, Robert H. Philibosian and Steve White, Chief Assistant Attorneys General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., William R. Weisman, David F. Glassman and Richard D. Marino, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BIRD, C. J.—This is an automatic appeal from a judgment imposing a sentence of death under the 1977 death penalty legislation. (See Pen. Code, § 1239, subd. (b), former Pen. Code, § 190 et seq., repealed by initiative measure approved Nov. 7, 1978.)[1]

Of the numerous claims made on appeal, this court need consider only one—that the trial court erred in summarily denying appellant's discovery motion. Decisions of this court, recently codified by the Legislature, require that this contention be sustained and that appellant's convictions be reversed.

I.

A. *Procedural History*

Appellant was accused by information of murdering Scott F. and Ralph C. on July 26, 1976, and Carl C., Jr. (Carl Jr.), on October 22, 1978. The prosecution also alleged a multiple murder and a felony-murder (lewd or lascivious conduct) special circumstance in connection with the 1978 murder count. (Former § 190.2, subds. (c)(3)(iv) and (c)(5).)[2]

Prior to trial, appellant moved to suppress his confessions as well as certain other evidence relating to the crimes. The motion was premised both on an asserted lack of probable cause for appellant's arrest and on the involuntary nature of his confessions. This motion was denied.

---

[1] All statutory references are to the Penal Code unless stated otherwise.

[2] Other special circumstance allegations which had been charged in connection with the 1976 killings were stricken prior to trial. (See *People* v. *Teron* (1979) 23 Cal.3d 103 [151 Cal.Rptr. 633, 588 P.2d 773].)

Thereafter, appellant waived his right to a jury trial on the question of guilt, and the case was transferred to a different judge for trial. In an *in limine* motion under Evidence Code section 405, appellant renewed his motion to suppress the confession on the ground of involuntariness.[3] Although live testimony was presented, the motion was submitted primarily on the transcripts of the pretrial suppression motion and the preliminary examination. This motion was denied.

A trial on the merits was then had based on the evidence presented at the hearing on the *in limine* motion. After additional testimony from the defense was presented, the court found appellant guilty of (1) first degree murder as to the Carl Jr. and Ralph C. killings and (2) second degree murder as to the Scott F. homicide. The court also found the multiple murder special circumstance allegation true and the felony-murder special circumstance allegation not true.

Appellant waived his right to a jury trial on the question of penalty. At appellant's request and because of disagreements between appellant and his counsel, counsel was relieved. A second lawyer was appointed, but was later permitted to withdraw on his own motion. The penalty phase proceedings were eventually conducted, over appellant's objection, without the presence of an attorney for the defense. No additional evidence was presented. Thereafter, the court imposed a judgment of death for the 1978 Carl Jr. murder. Appellant was sentenced to prison for life and for the term prescribed by law for the 1976 Scott F. and Ralph C. murders, respectively.

## B. *The Disappearance of Carl Jr. and the Arrest*

About 8 p.m. on Sunday, October 22, 1978, the parents of seven-year-old Carl Jr. called the South Gate Police Department to report that their son had been missing since about 6 o'clock that evening. The police quickly began searching for the boy but were unable to locate him.

Detective William Sims of the South Gate Police Department was assigned to investigate the disappearance. In the course of his investigation,

---

[3]Since none of the exceptions mentioned in section 1538.5 was applicable, the earlier denial of the pretrial motion to suppress was binding on the trial judge with respect to matters covered by that statute. (See § 1538.5, subds. (h), (i), (m); *Madril* v. *Superior Court* (1975) 15 Cal.3d 73, 77-78 [123 Cal.Rptr. 465, 539 P.2d 33].) Thus, the parties could not relitigate at the trial the legality of appellant's arrest.

However, appellant had raised involuntariness as an alternative ground for the pretrial motion to suppress his confessions. The admissibility of a confession, standing alone, is outside the scope of a section 1538.5 motion. (*People* v. *Superior Court* (*Zolnay*) (1975) 15 Cal.3d 729, 733-735 [125 Cal.Rptr. 798, 542 P.2d 1390].) While such evidence may be the subject of a pretrial common law motion to suppress, a ruling on that type of motion is not binding on the trial judge. (*Ibid.*; *Saidi-Tabatabai* v. *Superior Court* (1967) 253 Cal.App.2d 257 [61 Cal.Rptr. 510].)

Sims contacted one Joan Julian, a psychic. Julian helped a police artist prepare a sketch of a person whom she visualized as having been with Carl Jr. at the time of his disappearance.

On Friday, October 27, 1978, Detective Sims went to the missing boy's parents' house and showed them the sketch. They said it resembled "Butch," a name commonly used for appellant. They told Sims that Carl Sr. (the missing boy's father) occasionally repaired cars for appellant and that appellant had dropped off his Volkswagen for repair about 11 p.m. on the night their son disappeared. Having no "good information" with regard to Carl Jr.'s disappearance and wanting to check out all possible leads, Detective Sims decided to talk with appellant "as a witness."

Sims and his partner Detective Louis Gluhak drove to appellant's apartment, which was located about one and one-half miles from Carl Jr.'s home. Sims knocked on the door, and appellant answered. The officers identified themselves and explained that they were investigating the disappearance of Carl Jr. Appellant invited them in. When the officers requested identification, appellant produced his driver's license. At some point, appellant said, "I knew you were coming sooner or later." Stating that the officers were "going to find out anyway," appellant indicated he had previously been in Atascadero State Hospital because he "went into a fit of rage and beat the shit out of a nine-year-old boy" in Huntington Park. Apparently, the officers did not inquire further into this topic.

Detective Sims asked appellant if he "had seen anything unusual in the area of [Carl Jr.'s home] the night he was dropping off his vehicle for Mr. [C.] to repair." Appellant said no.

While talking to appellant, the officers noticed on the walls and shelves "literally hundreds" of photographs of clothed and partially clad young boys. They also saw numerous "magazine type" pornographic books on the floor and the furniture. The officers testified these items were plainly visible from where they sat in the living room. They denied searching the apartment during this visit.[4]

---

[4]Appellant admitted that photographs of nude boys were in his apartment, but denied they were in plain view. He claimed they were in the bedroom in a manila envelope that in turn was inside a blue document pouch.

The defense argued that it was unlikely that appellant would have had these items plainly visible in the apartment, especially if, as the officers contended, appellant knew they were coming. Instead, appellant claimed that this photographic material was discovered during a subsequent warrantless search of the apartment, conducted while appellant was being interrogated at the jail. The police denied that such a search occurred.

Appellant corroborated his claim with the testimony of three witnesses. They had visited the apartment, and had observed no pornographic photographs or magazines on the walls or otherwise in plain view.

The officers then departed. Although appellant had told the officers he was going to purchase the automobile part that Carl Sr. needed to repair his Volkswagen, he remained behind in the apartment.[5]

The officers drove back to Carl Jr.'s residence and spoke again with his parents, inquiring primarily about appellant. About 15 minutes later, appellant arrived with the part for the Volkswagen. He delivered it to Carl Sr., who said he would fix the car. As appellant started walking back toward his Plymouth, the officers followed.

When appellant and the officers arrived at the Plymouth, Sims asked him to explain what he had seen when he dropped off the Volkswagen on the night of Carl Jr.'s disappearance. Appellant replied, "Oh, yeah. I remember now." He then related that about 6 p.m. on Sunday he had gone to a restaurant located near the C.'s home. The line was too long, so he decided to stop by the house to talk to Carl Sr. about working on the car. When appellant got to the back door of the house, he met Carl Jr. and asked him if he wanted to have a Coke. Appellant then took the boy to a restaurant about three or four blocks away and bought him a soft drink. Appellant indicated that the last time he saw Carl Jr., the boy was walking down the street toward his home. He denied that he had harmed the boy.

After appellant made these remarks, Detective Sims arrested him for "investigation of 207," or "suspicion of kidnaping." Appellant was handcuffed and driven to the South Gate City jail.[6]

---

[5]Appellant's version of this encounter with Detectives Sims and Gluhak differed in several other respects.

According to appellant, the initial contact occurred on the street, as he was leaving in his Plymouth to purchase the part that Carl Sr. had told him was needed to repair the Volkswagen. Thereafter, Sims allegedly asked appellant if it was "all right" to search his apartment. Appellant queried if it would "do [him] any good to say no." Sims replied, "no," and started toward the apartment. Believing that the officers would break down the door if he did not open it, appellant let them in.

The officers conducted a relatively brief search of the apartment, but seized nothing. All three then left the apartment together, appellant intending to purchase the part for his Volkswagen. Sims then asked for permission to search the trunk of appellant's Plymouth. Appellant again acquiesced, and a search was conducted. Nothing was seized.

[6]Appellant testified to a different version of the encounter at appellant's Plymouth. According to appellant, only Detective Sims followed him to the car. When Sims asked if appellant could talk, appellant agreed but said he was in a hurry because of a dinner date.

Sims asked appellant when he had last seen the missing boy. Appellant indicated the previous Saturday. Appellant denied telling Sims that he had taken the boy to the restaurant or that he had even seen him on the Sunday of his disappearance.

Shortly thereafter, Detective Gluhak joined the conversation. One of the officers asked if appellant would be willing to take a polygraph test. After some discussion, appellant agreed. Because of his dinner date, he wanted to schedule the test for the following Monday, but Sims wanted it done that evening. Sims said that it would not take long and that appellant would be on his way quickly. Appellant then agreed, and he was driven—without handcuffs—to the police station.

C. *The Interrogations*

The record contains sharply conflicting versions of what occurred between appellant's arrival at the South Gate City jail and his confessions some five hours later.

According to the officers involved, appellant was driven to the jail by Detectives Sims and Gluhak immediately after the arrest. He was placed in an eight-by-twelve-foot interrogation room where he was joined by the two officers. At approximately 5:15 p.m., appellant was advised of and voluntarily waived his constitutional rights. (See *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 1074].) He essentially reiterated what he had told the officers just prior to his arrest.

Appellant returned to his cell. Thereafter, Sims directed two other officers—Detectives Lloyd Carter and Dennis Greene—to make some inquiries of people living in appellant's neighborhood.[7] These inquiries did not produce any new information. The officers did not search appellant's home or his Plymouth at that time.

At some point, Sims and Gluhak informed Carter that appellant "was not giving any information about the case." They requested Carter to assist them in the interrogation. About 10 p.m., after Carter and Greene had returned to the jail, appellant was brought into the interrogation room for a second time. Appellant and the four plainclothes officers (Sims, Gluhak, Carter, and Greene) were present. To "explain [Carter and Greene's] presence," Carter told appellant that he (Carter) was "the boss" or "the boss man" and that "what [he] said went." Sims again advised appellant of his *Miranda* rights, and appellant again waived them. Carter conducted the subsequent interrogation.

Initially, appellant said he would not speak with Carter because he thought the interrogation room might be "bugged." Appellant asked Carter to have the other officers leave the room, and he requested that Carter prove there were no hidden tape recorders or listening devices. The three officers left, and Carter and appellant inspected the room. They found nothing. Appellant also wanted to know whether Carter was going to take notes of the interrogation. Carter indicated he would do what appellant desired, and appellant responded that he did not want any notes taken.

The other three officers then returned to the interrogation room, and appellant proceeded to confess to killing Carl Jr. In addition, when asked

---

[7]Detective Carter apparently conversed with several young boys in the neighborhood.

whether he was responsible for "other such incidents," he confessed to killing two other youths in Bell Gardens in 1976. The interrogation session ended about 12:30 a.m. Thereafter, while waiting to take the officers to Carl Jr.'s body, appellant agreed to repeat his confessions and to permit Carter to take notes. At no point during the interrogations did appellant request a lawyer, nor did the officers make any express or implied promises or threats during the second interrogation.

Later that night, according to the South Gate officer who transported appellant back to the jail from the area where Carl Jr.'s body was recovered, appellant remarked that Detective Carter had been "a very wonderful person" to him. Appellant further stated that the South Gate officers "had been very, very nice to him, and he couldn't understand how [they] could be so nice to him since he had done such a terrible thing." The following afternoon, appellant told officers from Bell Gardens that he was being treated "fine." He also "made some comment about his admiration for Detective Carter."

The defense version of these events was quite different. According to appellant, there were four separate interrogation sessions, none of them preceded by *Miranda* warnings. The first two interrogations were conducted by Detectives Sims and Gluhak. At the first session, appellant repeated the story he had told the officers prior to his arrest. (See *ante,* fn. 6.) At the second, Sims showed appellant some boys' clothing and asked why it had been in appellant's apartment. Appellant denied that the clothing belonged to the missing boy, but Sims appeared to disbelieve him.[8]

Appellant then asked about the delay in setting up the lie detector test. Sims said he *was not going to give the test,* because he had been informed by the Huntington Park police that appellant was a "sicko." Appellant replied that he still wanted to go home. Sims became angry and told appellant he was under arrest for kidnaping. Appellant was then taken to a small one-person jail cell.

Some time thereafter, appellant was brought to the interrogation room for a third time. Detectives Sims, Gluhak, Carter, and Greene were there. Carter stated that he was the "boss man" and that he was going to get some answers. Appellant repeated the story he had told Sims and Gluhak.

Carter was not satisfied with appellant's answers. Carter then made reference to Detective Greene, a large, muscular officer who was sitting on

---

[8]If appellant was shown such clothing, it clearly was not Carl Jr.'s, since his clothes were not found until after the interrogation.

the floor at the interrogation room door, flexing his muscles. Carter noted that Greene was a "pretty big guy" and asked appellant if he thought he could beat Greene in a fight. Appellant said no. Carter indicated that Greene knew how to fight and how to get answers.[9]

Carter directed appellant's attention to a portion of the interrogation room wall where the plaster had been broken out. This four- or five-inch wide depression or "hole" was located to appellant's right, about shoulder level as he sat at the table. Carter asked appellant how he thought the hole had been created. Appellant understood that Carter was "either planning on enlarging it or making another one similar with [appellant's] head." Appellant changed the subject.

Appellant asked Carter why he had not been given his rights. Carter said that the police had "intentionally" done a number of things wrong. Carter indicated that he knew appellant was mentally ill and that he could help him return to Atascadero State Hospital if he cooperated. Appellant said he had cooperated when he agreed to take the polygraph test.

The officers then directed appellant to stand up, pull up his shirt, and drop his pants to his knees. One of the officers stated that they had found some pictures, and "were just comparing what they could see against the pictures." Appellant complied.

Appellant said he wanted to talk with a lawyer, but Carter became angry and asked appellant whether he wanted to talk or fight. Carter again asked appellant how he thought the hole in the wall had been created.

Appellant began to cry. Carter again said he would have appellant returned to Atascadero if he cooperated. Appellant asked permission to talk with Linda B., an acquaintance who was also a reserve deputy sheriff and lived nearby. Carter agreed, and appellant was allowed to make two telephone calls.[10]

---

[9]Appellant is 5 feet 10 inches tall and weighed 165 pounds. Detective Greene, a weight-lifter, is 6 feet 2 inches tall and weighed between 220 and 225 pounds.

Greene testified that he spent most of the interrogation either standing or sitting directly against the interrogation room door.

[10]Linda B. testified she received a telephone call from appellant shortly after 8 p.m. Appellant said he was being held at the South Gate jail for kidnaping, and he asked her to come to the jail to talk with him. Linda agreed. She also spoke with an officer, who confirmed what appellant had told her. This officer told Linda to come over if she had "any information." In her testimony, she described appellant as "sound[ing] quiet, subdued, upset, his voice was shaky. . . ." Linda later came to the jail, but the record does not disclose what she did there.

Appellant's second telephone call was to Helen J., with whom he had had dinner plans on the night of the arrest. She testified that appellant called her about 8:30 p.m., and told her he was at the South Gate jail for possible kidnaping. He asked her to come to the jail, and said that Detective Sims wanted to talk with her. She agreed to do so, and later came and spoke with Sims.

Jail records indicate the telephone calls were made between 8:20 and 8:30 p.m.

Shortly after completing the telephone calls, appellant was brought to the interrogation room for the fourth time. The four officers were present. Appellant asked Sims where Linda B. was, and Sims indicated she was out front. Appellant said he wanted to talk with her, but Sims refused, saying appellant should have talked with her on the telephone.

Detective Carter then began intensive questioning about the kidnaping. Appellant was afraid of the four officers in the room, especially Greene. He asked to speak to Carter alone, since he "figured if [he] was talking alone, [he] was less likely to get hurt." All the officers except Carter then left the room.

Appellant asked Carter if the room was "bugged." Carter said no and offered to help check it out. Appellant declined, saying it was not possible to "check it out physically that way." Appellant told Carter that "the reason [he] wanted to talk to him alone, other than being afraid of Greene, was that if [Carter] couldn't, wouldn't, or changed his mind about keeping his promise about sending [him] back to Atascadero, then [he] would deny everything that [Carter] claimed [he] said during that interrogation." Carter agreed to this plan.

Appellant then reiterated the story he had been telling throughout the evening. Carter "reminded" appellant that Greene was nearby and that "there were ways of finding out." He said "[m]aybe [appellant] would like [his] head to make a matching hole in the wall or something." Appellant began to cry and confessed to killing Carl Jr.

Carter said this was not enough to get appellant back to Atascadero and asked if there were other incidents. Appellant said there were none. Carter said appellant would not live long in a state prison and "wondered if Greene could uncover anything else." Appellant then confessed to the 1976 Bell Gardens killings.

The other officers then returned to the room and appellant repeated his confessions.

On many of the critical points, appellant's testimony was contradicted by that of the interrogating officers. In addition to testimony previously mentioned, Detective Carter denied telling appellant he would try to have him admitted to Atascadero State Hospital. Carter and Greene also denied that there was any discussion of a hole in the interrogation room wall or that they ever used such a hole as a threat or an "interrogation tool." Carter remembered that such a hole had existed, but he was unable to recall whether it was still there on the day of appellant's interrogation.

The defense sought to support appellant's testimony in several ways. For example, the defense attempted to photograph the hole in the interrogation room wall. On December 14, 1978, defense counsel sought an ex parte order authorizing his investigator to photograph the hole. In a supporting affidavit, counsel articulated his fear that "if [the police are] given sufficient warning, the hole, if it exists, may be repaired." The trial court declined to issue an ex parte order, but the following day the investigator was allowed to photograph the interrogation room. He found a fresh plaster patch, about 12 inches square, covering the area where appellant testified the hole had been.[11]

In addition, appellant moved the court for discovery of the records of complaints of excessive force and aggressive behavior on the part of the four interrogating officers, as well as twelve other South Gate officers who assertedly trained or supervised them. At the hearing on the discovery motion, defense counsel stated that despite "a limited ability to get witnesses in this regard," he had been able to find three or four persons who had assertedly confessed after being threatened or beaten by South Gate police officers.[12] One of these persons was a man who had allegedly confessed to a murder and led police officers to the victim's body, but whose case was dismissed when the prosecution discovered that the man had been in jail at the time of the killing. The court summarily denied the discovery motion.

Thereafter, on his own, defense counsel attempted to locate witnesses to other confessions assertedly coerced by threats or violence by South Gate officers.[13] In the 10 months he represented appellant prior to trial, counsel came across 17 such persons, none of whom knew of appellant at the time they made their allegations of mistreatment. Only two of these persons—Angelina N. and Michael B.—implicated any of the officers who had interrogated appellant. The trial court permitted them—but none of the remaining individuals—to testify at the hearings on appellant's motions.[14]

---

[11]A photograph of the wall showing the plaster patch was admitted as an exhibit at the hearing.

[12]Counsel stated he also had "probably five or six other people" with "similar" experiences with South Gate police officers. In addition, the superior court judge sitting at the hearing on the discovery motion was apparently "in the middle of a hearing where somebody hung himself while being interrogated by the South Gate Police Department or during investigation by the South Gate Police Department."

Defense counsel did not specifically correlate any of the various incidents with the officers mentioned in the discovery motion.

[13]The size of the South Gate Police Department is not made clear in the record. Defense counsel suggested that the 16 officers mentioned in his discovery motion comprised the department's detective bureau. The prosecutor believed that the 16 officers were "almost the whole department."

[14]Also not permitted to testify were the lawyers who had been in charge of the South Gate branch of the Los Angeles Public Defender's office during the previous two and one-half

Both Angelina N. and Michael B. testified to having been beaten and threatened by Detective Greene. Angelina stated that during an interrogation on November 1, 1978, Greene pointed to a hole in the interrogation room wall and told her he "was going to push [her] head through that hole the same way he did to someone else's." Michael testified that Greene interrogated him on February 2, 1979. During the interrogation, Greene accused Bridges of lying, adding that "if [Michael] didn't tell him what he wanted to know that he would put [his] head through the [interrogation room] wall." Greene also mentioned "something about that they paint the room so often because they be knocking [*sic*] the paint off the wall."

At the hearing, Greene denied striking Angelina and said he did not interview her alone in the interrogation room as she had testified. Greene did not testify in response to Michael's claims.[15]

## II.

Prior to trial, appellant moved to discover information regarding complaints against South Gate Police Department officers—including the four officers who had participated in appellant's postarrest interrogation. His motion requested the identity of individuals who had filed complaints "relating to unnecessary acts of aggressive behavior, . . . violence, and/or attempted violence, and . . . excessive force and/or attempted excessive force" against 16 officers in the department. Appellant also sought discovery of investigative reports based on these complaints, including statements of witnesses interviewed, information concerning the officers' use of excessive force or violence contained in personnel files, statements of psychiatrists, psychologists, or other officers contained in such files, and findings of disciplinary actions taken against any officers as a result of their use of force and violence. The purpose of such information, it was alleged, was to enable appellant to bolster his claim that his confession had been coerced.

At the hearing on the motion, defense counsel furnished additional information to the court. He revealed statements by four individuals who had asserted brutality and intimidation by South Gate officers during recent interrogations. In addition, counsel presented an affidavit in which the supervising public defender in South Gate indicated the absence of any "*Miranda* calls" during his tenure in that office. (See *ante,* p. 673 & fn. 14.)

---

years. In his offer of proof, defense counsel represented that these witnesses would testify that during their tenure, "neither they nor to their knowledge anybody under them ever received a call from the South Gate Police Department requesting counsel to be present during questioning or prior to questioning of any individual that was in custody."

[15]The trial court stated it did not believe the testimony of Angelina or Michael.

Following argument by counsel and the prosecutor, the trial court denied the motion. Appellant claims error in this ruling.

The Attorney General posits a number of reasons why this court should uphold the trial court's ruling. First, he maintains that appellate review should be precluded because appellant failed to seek a pretrial writ to overturn the ruling. Second, he contends that the trial court's denial of the discovery motion was proper because appellant failed to personally aver that his confession was the product of excessive police force. Third, even assuming the propriety of a declaration by counsel, respondent claims that the motion was deficient in that it failed to show a "plausible justification" for the desired information. Finally, he asserts that the information sought by the motion was unnecessarily broad to fulfill its intended purpose.

■ Respondent's first contention is that appellant's failure to seek pretrial review of the discovery ruling precludes this court from reaching the merits of the claim.[16] While respondent correctly notes that pretrial review is appropriate in discovery matters (see *Hill* v. *Superior Court* (1974) 10 Cal.3d 812, 816 [112 Cal.Rptr. 257, 518 P.2d 1353, 95 A.L.R.3d 820]; *Joe Z.* v. *Superior Court* (1970) 3 Cal.3d 797, 801 [91 Cal.Rptr. 594, 478 P.2d 26]), he fails to cite any authority for the proposition that such review is a prerequisite to review of discovery error on appeal. Indeed, several courts on direct appeal have entertained claims of erroneously denied discovery motions of the type involved in this case. (See, e.g., *People* v. *Castain* (1981) 122 Cal.App.3d 138, 144-145 [175 Cal.Rptr. 651]; *People* v. *Matos* (1979) 92 Cal.App.3d 862, 867-868 [155 Cal.Rptr. 293]; *In re Valerie E.* (1975) 50 Cal.App.3d 213, 217-219 [123 Cal.Rptr. 242, 86 A.L.R.3d 1163]; *People* v. *Woolman* (1974) 40 Cal.App.3d 652, 654 [115 Cal.Rptr. 324].)

Respondent's argument also fails to recognize the unwarranted consequences which might result from a pretrial writ requirement. In addition to unnecessary delay and added expense (cf. *People* v. *Freeman* (1977) 76 Cal.App.3d 302, 310-311 [142 Cal.Rptr. 806]), such a requirement would limit the exercise of this court's appellate jurisdiction, particularly in death penalty cases. (See Cal. Const., art. VI, § 11.) This court's constitutional responsibility in such cases should not be so easily circumscribed by procedural barriers, especially where the people of this state have not clearly spoken on the issue.

---

[16]In his reply brief, appellant correctly alleges that a pretrial writ petition was filed in the Court of Appeal in April 1979. (*Memro* v. *Superior Court,* 2 Civ. 55879, summarily den. May 4, 1979.) However, he fails to note that the petition challenged only the denial of his motion to suppress, and raised no error concerning discovery.

It is also noteworthy that in analogous contexts California courts have declined to impose barriers to appellate review where important rights are involved. For example, the courts have sanctioned review on appeal of speedy trial rulings (*People* v. *Wilson* (1963) 60 Cal.2d 139, 150 [32 Cal.Rptr. 44, 383 P.2d 452]), have held that no certificate of probable cause is required in juvenile appeals (*In re Joseph B.* (1983) 34 Cal.3d 952, 959-960 [196 Cal.Rptr. 348, 671 P.2d 852]), and have rejected a pretrial writ requirement as a condition to review of an unsuccessful *pro se* motion on appeal (*People* v. *Freeman, supra,* 76 Cal.App.3d at pp. 310-311). Since discovery rights are equally important, this court declines to impose a pretrial writ requirement as a condition to review on appeal.

 Respondent next asserts that the trial court properly denied appellant's discovery motion since the declaration accompanying the motion was executed by counsel and did not contain appellant's *personal* averment that his confession was the product of excessive police force. Respondent argues that a rule recognizing counsel's "mere assertions" as sufficient to obtain discovery "would tend to condone and to foster abuse of the discovery procedure."[17]

This argument is without merit. Evidence Code section 1043, subdivision (b)(3), which governs discovery of peace officer personnel records, contains no requirement of a "personal" affidavit on the part of the accused. (See *post,* fn. 19.) That statute, in effect when the trial judge ruled on appellant's motion, controls the present case.

It is noteworthy that an overwhelming majority of the Courts of Appeal, even before the enactment of Evidence Code section 1043, subdivision (b)(3), dealt with the merits of discovery errors where the averments in support of discovery were made only by counsel. (E.g., *Cadena* v. *Superior Court* (1978) 79 Cal.App.3d 212, 215 [146 Cal.Rptr. 390]; *Dell M.* v. *Superior Court* (1977) 70 Cal.App.3d 782, 787 [144 Cal.Rptr. 418]; *Caldwell* v. *Municipal Court* (1976) 58 Cal.App.3d 377, 379-380 [129 Cal.Rptr. 834]; *In re Valerie E., supra,* 50 Cal.App.3d at p. 217.)[18]

 Respondent's next contention in favor of the trial court's ruling is that appellant demonstrated no "plausible justification" for the information

---

[17]Apparently the trial judge did not agree with this argument, since he stated that the denial of the motion was not based on "the position asserted by the district attorney's office that [counsel's] affidavit was insufficient."

[18]Although one Court of Appeal has intimated that a personal averment is required (*People* v. *Navarro* (1978) 84 Cal.App.3d 355, 359 [146 Cal.Rptr. 672]), the case has not been read that narrowly. (*Tyler* v. *Superior Court* (1980) 102 Cal.App.3d 82, 87 [162 Cal.Rptr. 82].) In any event, to the extent *Navarro* suggests such a requirement, it is inconsistent with Evidence Code section 1043.

requested. A brief review of the law of discovery in criminal cases is helpful in resolving this claim.

▮ The power of a trial court to provide for discovery in criminal cases exists "even in the absence of constitutional mandate or enabling legislation." (*Reynolds* v. *Superior Court* (1974) 12 Cal.3d 834, 837 [117 Cal.Rptr. 437, 528 P.2d 45].) Such power is among those inherent in "every court to develop rules of procedure aimed at facilitating the administration of criminal justice and promoting the orderly ascertainment of the truth." (*Joe Z.* v. *Superior Court, supra,* 3 Cal.3d at pp. 801-802.)

The exercise of these powers is consistent with "the fundamental proposition that [the accused] is entitled to a fair trial and an intelligent defense in light of all relevant and reasonably accessible information." (*Pitchess* v. *Superior Court* (1974) 11 Cal.3d 531, 535 [113 Cal.Rptr. 897, 522 P.2d 305].) As Chief Justice Traynor once noted, "in the absence of a countervailing showing by the prosecution that the information may be used for an improper purpose, discovery is available not merely in the discretion of the trial court, but as a matter of right." (Traynor, *Ground Lost and Found in Criminal Discovery* (1964) 39 N.Y.U. L.Rev. 228, 244 [hereafter *Traynor*].) Thus, it is established that an accused is entitled to any "'pretrial knowledge of any unprivileged evidence, or information that might lead to the discovery of evidence, if it appears reasonable that such knowledge will assist him in preparing his defense. . . .'" (*Ballard* v. *Superior Court* (1966) 64 Cal.2d 159, 167 [49 Cal.Rptr. 302, 410 P.2d 838] quoting *Traynor, op. cit. supra,* 39 N.Y.U. L.Rev. at p. 244.)

Finally, it is noteworthy that one legitimate goal of discovery is to obtain information "for possible use to impeach or cross-examine an adverse witness . . . ." (*Foster* v. *Superior Court* (1980) 107 Cal.App.3d 218, 227 [165 Cal.Rptr. 701].) ▮ As this court observed almost 30 years ago, "[a]bsent some governmental requirement that information be kept confidential for the purposes of effective law enforcement, the state has no interest in denying the accused access to all evidence that can throw light on issues in the case, and in particular it has no interest in convicting on the testimony of witnesses who have not been as rigorously cross-examined and as thoroughly impeached as the evidence permits." (*People* v. *Riser* (1956) 47 Cal.2d 566, 586 [305 P.2d 1].)

In 1974, these principles were applied to permit discovery of police personnel records. In *Pitchess* v. *Superior Court, supra,* 11 Cal.3d 531, this court enunciated several rules to guide practitioners and trial courts in this area. ▮ *Pitchess* made it clear that "an accused . . . may compel discovery by demonstrating that the requested information will facilitate the

ascertainment of the facts and a fair trial. . . . The requisite showing may be satisfied by general allegations which establish some cause for discovery other than 'a mere desire for the benefit of all information which has been obtained by the People in their investigation of the crime.' . . ." (*Id.*, at pp. 536-537, citations omitted.)

*Pitchess* involved an arrestee who asserted self-defense to a charge of battery on a police officer. (§ 243.) The accused sought discovery of statements by complainants against the officers and disciplinary records in the police department's possession concerning the officers' propensity to commit acts of violence. (11 Cal.3d at p. 537.) This court held both types of information discoverable. The statements were held necessary to effectively cross-examine the officers at trial and to refresh the complainants' recollection of events which had transpired "some time ago." The disciplinary records were held "unquestionably relevant and admissible" as character evidence of the deputies' tendency to engage in violence. (*Ibid.*; see Evid. Code, § 1103.)

*Pitchess* also held the accused's request sufficient on the ground that the information sought was relevant to his defense and was "not 'readily obtain[able] . . . through his own efforts.'" (*Id.*, at p. 537.) The documents had been requested "with adequate specificity to preclude the possibility that defendant [was] engaging in a 'fishing expedition.'" (*Id.*, at p. 538.)

These guidelines were enunciated "'in the absence of legislation'" (*id.*, at pp. 535-536), and for several years guided the Courts of Appeal in passing upon similar issues. Four years after *Pitchess*, the Legislature spoke in the area. Effective January 1, 1979—just eight days before the hearing on appellant's discovery motion—provisions were added to our law which guarantee the confidentiality and nondisclosure of peace officer personnel records and records of citizens' complaints "except by discovery pursuant to Section 1043 of the Evidence Code." (§ 832.7.)

Evidence Code section 1043 outlines the procedure for requesting discovery of peace officer personnel records. That statute requires a "good cause" showing by affidavit setting forth the materiality of such information, and an allegation that the governmental agency identified in the request "has such records or information . . . ."[19]

---

[19]The motion required by section 1043 "shall include:

"(1) Identification of the proceeding in which discovery or disclosure is sought, the party seeking discovery or disclosure, the peace officer whose records are sought, the governmental agency which has custody and control of such records, and the time and place at which the motion for discovery or disclosure shall be heard;

"(2) A description of the type of records or information sought; and

Once this procedure has been complied with and notice has been provided to the agency having custody of the records, the trial court conducts an *in camera* examination of the material to determine its relevance to the case at hand. Certain information is immune from disclosure, while other information may be released according to the guidelines provided in Evidence Code section 1045.[20] (See generally *Review of Selected 1978 California Legislation* (1979) 10 Pacific L.J. 431 [hereafter *Selected Legislation*].)

It is significant that these statutes do not limit discovery of such records to cases involving altercations between police officers and arrestees, the context in which *Pitchess* arose. It is also noteworthy that the Legislature saw fit to ensure that "[n]othing in this article [Evid. Code, § 1040 et seq.]

---

"(3) Affidavits showing good cause for the discovery or disclosure sought, setting forth the materiality thereof to the subject matter involved in the pending litigation and stating upon reasonable belief that such governmental agency identified has such records or information from such records." (Evid. Code, § 1043, subd. (b).)

As *Arcelona* v. *Municipal Court* (1980) 113 Cal.App.3d 523, 529-530 [169 Cal.Rptr. 877] correctly observed, "[i]n determining whether 'good cause' is shown within the meaning of Evidence Code section 1043, we are guided by the definitive interpretations provided by *Pitchess* and its progeny since we may presume that the Legislature used that term in the precise sense which had been placed upon it by the courts. (*People* v. *Curtis* (1969) 70 Cal.2d 347, 355 [74 Cal.Rptr. 713, 450 P.2d 33].)" Moreover, since the "good cause" test is similar to the "plausible justification" test enunciated in this court's pre-*Pitchess* cases (see, e.g., *Ballard* v. *Superior Court, supra,* 64 Cal.2d at p. 167), it can be assumed that in enacting Evidence Code section 1043, the Legislature did not intend to overrule discovery cases applying that standard as well. (See, e.g., *Reyes* v. *Municipal Court* (1981) 117 Cal.App.3d 771, 775 [173 Cal.Rptr. 48].)

[20]Evidence Code section 1045 provides in part:

"(a) . . . . . . . . . . . . . . . . . . . . . . .

"(b) In determining relevance the court shall examine the information in chambers in conformity with Section 915, and shall exclude from disclosure:

"(1) Information consisting of complaints concerning conduct occurring more than five years before the event or transaction which is the subject of the litigation in aid of which discovery or disclosure is sought.

"(2) In any criminal proceeding the conclusions of any officer investigating a complaint filed pursuant to Section 832.5 of the Penal Code.

"(3) Facts sought to be disclosed which are so remote as to make disclosure of little or no practical benefit.

"(c) In determining relevance where the issue in litigation concerns the policies or pattern of conduct of the employing agency, the court shall consider whether the information sought may be obtained from other records maintained by the employing agency in the regular course of agency business which would not necessitate the disclosure of individual personnel records.

"(d) Upon motion seasonably made by the governmental agency which has custody or control of the records to be examined or by the officer whose records are sought, and upon good cause showing the necessity thereof, the court may make any order which justice requires to protect the officer or agency from unnecessary annoyance, embarrassment or oppression.

"(e) The court shall, in any case or proceeding permitting the disclosure or discovery of any peace officer records requested pursuant to Section 1043, order that the records disclosed or discovered may not be used for any purpose other than a court proceeding pursuant to applicable law."

shall be construed to affect the right of access to records of complaints, or investigations of complaints, or discipline imposed as a result of such investigations, concerning an event or transaction in which the peace officer participated, or which he perceived, and pertaining to the manner in which he performed his duties, provided that such information is relevant to the subject matter involved in the pending litigation." (Evid. Code, § 1045, subd. (a).) If anything, then, the principles of *Pitchess* were not only reaffirmed but expanded by the 1978 legislation.

 It is against this decisional and statutory backdrop that the trial court's summary denial of appellant's motion must be evaluated. In his motion, appellant sought to discover nine categories of information relating to conduct on the part of sixteen named South Gate police officers.[21] In the accompanying declaration, counsel alleged that four of the named officers had been present during appellant's confession, which appellant asserted "came after an illegal arrest, promises of leniency, and threats of violence by the officers present." All 16 officers were alleged to have been trained by each other and to "follow the same general interrogation routine."

---

[21]The nine categories of information requested in appellant's motion were:

"1. The names and addresses and telephone numbers of all persons who have filed complaints with the South Gate Police Department against Officers Sims, Gluhack, Green[e], Carter, Smith, Simpcoe, Porter, Fitzgerald, Biggins, Kennedy, Nixon, Meyers, Christ, Miller, Brunty, and Troxcil relating to unnecessary acts of aggressive behavior, acts of violence, and/or attempted violence, and acts of excessive force and/or attempted excessive force.

"2. The dates of the filing of the complaints described in item number 1, *supra*.

"3. The names, addresses, telephone numbers, and any other information which would assist the defense in locating all persons interviewed by the South Gate Police Department, investigators and other personnel during investigations into said complaints as described in item number 1, *supra*.

"4. Verbatim copies of all statements, written or oral, made by persons who have brought complaints as described in item number 1, *supra*.

"5. Verbatim copies of all statements, written or oral, made by persons interviewed during investigations as described in item number 1, *supra*.

"6. Verbatim copies of all investigative reports made as a result of the complaints described in item number 1, *supra*.

"7. Verbatim copies of all records, reports, reports of investigations, and all other writings pertaining to the use of excessive force, aggressive conduct and/or violence, and improper tactics by the above-named officers contained in his personnel files or in the possession of said police agency.

"8. All records of statements, reputations, and opinions, including but not limited to findings, letters, formal reports, and oral conversations made by psychiatrists, psychologists, superior officers, and fellow officers of the above-named officers which pertain to unnecessary acts of aggressive behavior, acts of violence and/or attempted violence and acts of excessive force or attempted excessive force contained in the personnel files of said officers or in the possession of said police agency.

"9. All findings, reports, opinions, and transcripts of disciplinary actions or proceedings commenced or taken against the above-named officers by the South Gate Police Department, relating to said officers['] use of excessive force, aggressive conduct and violence."

Counsel also alleged that the information "would be used to show a continuing course of conduct by the South Gate Police Department which includes extraction of involuntary confessions or the attempt to extract involuntary confessions from citizens being detained or under arrest by the use of violence or attempted violence or force or threats of force, or unlawful aggressive behavior." In addition appellant hoped that such information would lead to evidence showing that it was the "habit and custom" of the officers to engage in violent behavior. He also sought to use the information to "effectively cross-examine said officers at trial, and for impeachment purposes where appropriate." The declaration further alleged that the South Gate Police Department was in possession of such information, and that the information was "not known to defendant or his counsel . . . ."

The Evidence Code clearly supported appellant's theory of discovery. Discovery might lead to evidence of habit or custom admissible to show that a person acted in conformity with that habit or custom on a given occasion. (Evid. Code, § 1105.) ██ "Habit" or "custom"[22] is often established by evidence of repeated instances of similar conduct. (See, e.g., *Dincau* v. *Tamayose* (1982) 131 Cal.App.3d 780, 793-796 [182 Cal.Rptr. 855].) Plainly, evidence that the interrogating officers had a custom or habit of obtaining confessions by violence, force, threat, or unlawful aggressive behavior would have been admissible on the issue of whether the confession had been coerced.

Furthermore, evidence of reputation, opinion, and specific instances of conduct is admissible to show, inter alia, motive, intent, or plan. (Evid. Code, § 1101, subd. (b).) Evidence that the interrogating officers had acted according to a plan or with a motive to coerce appellant's confession, or had intended to do so, would have been relevant to appellant's claim of involuntariness. Reputation or opinion evidence would also have been relevant on this issue. (3 Hogan, Modern Cal. Discovery (1981) § 20.03, p. 147; see par. 8 of appellant's request, *ante,* fn. 21.)[23]

*People* v. *Navarro, supra,* 84 Cal.App.3d 355 does not hold to the contrary. There, the trial court granted the accused *Pitchess* discovery on coun-

---

[22]"'Habit' means a person's regular or consistent response to a repeated situation. 'Custom' means the routine practice or behavior on the part of a group or organization that is equivalent to the habit of an individual." (2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 33.8, p. 1267.)

[23]The accused in *Pitchess* premised his discovery motion on a theory of admissibility under Evidence Code section 1103, which permits introduction of character or character trait evidence to prove a *victim's* conduct. (11 Cal.3d at p. 537.) Since appellant's theory was properly based on Evidence Code sections 1105 and 1101, subdivision (b), this court need not determine whether section 1103 also provides a basis for discovery when an accused seeks *Pitchess* information in a coerced confession context.

sel's declaration that " 'the defense may contend that the defendant did not voluntarily agree to provide a urine sample, but rather was coerced into providing [one] as a result of unlawful tactics and excessive force' . . . ." (*Id.*, at p. 357, italics omitted.) The Court of Appeal reversed, holding the justification for the discovery insufficient. (*Id.*, at pp. 359-360.)

*Navarro* is not authority for the proposition that a claim of coercion can never be grounds for discovery of police personnel records. Even that court observed that "[i]n a proper case and on a proper and substantial showing by way of detailed affidavit . . . it is conceivable the material sought might be discoverable." (84 Cal.App.3d at p. 359.)

Moreover, counsel's declaration satisfied *Pitchess* and Evidence Code section 1043. The declaration asserted that the confession had been coerced by promises of leniency and threats of violence. Evidence of coercion is relevant both to the admissibility of a confession and the weight it is to be given by the trier of fact. (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 607 [147 Cal.Rptr. 172, 580 P.2d 672]; see Evid. Code, § 607; *Jackson* v. *Denno* (1964) 378 U.S. 368, 386, fn. 13 [12 L.Ed.2d 908, 921, 84 S.Ct. 1774, 1 A.L.R.3d 1205].)[24] Since evidence concerning complaints of prior violence by the interrogating officers might have been admissible or might have led to other admissible evidence on that question, counsel's allegations sufficiently "set forth the materiality" of the requested information. (Evid. Code, § 1043, subd. (b)(3).)

Counsel's allegations were sufficient to put the court on notice that the voluntariness of the confession would be in issue. The declaration articulated a theory as to how the information would be used in litigating that question. While undoubtedly the factual allegations could have been more specific, they went far beyond expressing "a mere desire for the benefit of all information" which was in the prosecution's hands. (See *People* v. *Cooper* (1960) 53 Cal.2d 755, 770 [3 Cal.Rptr. 148, 349 P.2d 964]; *Joe Z.* v. *Superior Court, supra,* 3 Cal.3d at p. 805.[25]) Since counsel demonstrated

---

[24]As this court has observed, "although coercive methods do not necessarily produce a false confession, we have long recognized that they certainly may have that effect. [Citation.]" (*People* v. *Jimenez, supra,* 21 Cal.3d at p. 607.) For this reason, once a confession is deemed admissible, the trier of fact "may consider any evidence of coercion that may be presented by the defendant in order to determine the weight that [it] should be given. [Citation.]" (*Ibid.*)

[25]It is noteworthy that counsel's affidavit in *Joe Z.* seeking discovery of his minor client's statements to the police alleged only "that the information sought was necessary for the preparation of the defense, was relevant and material to the case, was solely in the control of [the prosecution], and was unknown to petitioner or his counsel." (*Id.,* at p. 805.) Although "the allegations could have been more precise and factual," this court found them sufficient to warrant discovery of that information. (*Ibid.*)

good cause for the information regarding the interrogating officers, the trial court erred in summarily denying the motion.

Respondent relies on *Tyler* v. *Superior Court, supra,* 102 Cal.App.3d 82, for the conclusion that appellant was not entitled to discover evidence pertaining to his coerced confession claim. That decision is neither persuasive nor on point.

In *Tyler,* the accused sought discovery of information regarding the officers' involvement in false arrests or illegal searches. (*Id.,* at p. 84.) He alleged "substantial inaccuracies" in the officers' preliminary examination testimony regarding the search and seizure in the case, as well as a "substantial likelihood" of such unlawful conduct in the past. (*Id.,* at p. 85.)

The Court of Appeal upheld the trial court's order denying discovery. First, the court held specific acts would not be admissible to attack the arresting officers' credibility. (Evid. Code, §§ 787, 1101, subd. (a).) Second, assuming the evidence would have been offered to prove a "common scheme or plan" or "habit or custom" on the officers' part, the accused failed to allege sufficient facts about the incident or its relation to other such incidents to establish a "plausible justification" for the discovery. (*Tyler* v. *Superior Court, supra,* 102 Cal.App.3d at pp. 88-90.)

*Tyler's* "credibility" rationale is unconvincing. It is true that in a voluntariness hearing "the trial court will often have to decide which one of two self-serving accounts to believe, as the testimony presented at [such a] hearing ordinarily consists of conflicting versions by the defendant and law enforcement officers as to what occurred during the interrogation of the defendant . . . ." (*People* v. *Jimenez, supra,* 21 Cal.3d at p. 606.) However, where self-defense is asserted to a charge of battery on a police officer or resisting arrest, a similar task is performed by the trier of fact. Such cases might also be viewed as credibility contests between the officer and the arrestee. However, *Pitchess* makes it clear that specific acts of conduct are admissible. Thus, to deny an accused *Pitchess*-type discovery on the assumption that its fruits would be used for impeachment fails to acknowledge the existence of other admissible grounds for the use of such evidence. On this point, *Tyler* fundamentally misreads the purpose of *Pitchess* discovery. To adhere to its premise would contravene well-settled law.[26]

*Tyler's* second rationale is inapposite here and misconstrues the "good cause showing" requirement in discovery cases. As counsel's declaration

---

[26]To the extent it relies on *Tyler, Sacramento City Police Dept.* v. *Superior Court* (1984) 156 Cal.App.3d 1193, 1197 [203 Cal.Rptr. 169] is disapproved.

in this case alleged, the information was sought to establish the officers' habit and custom for obtaining confessions by the use of force, violence or threats. This was sufficient. Appellant was not required to specify further the details of his claim of coercion in order to obtain the requested information. (See *ante,* at pp. 682-683.)

Appellant was also not required to furnish additional "foundational facts" about the information he sought in his motion. (*Tyler* v. *Superior Court, supra,* 102 Cal.App.3d at p. 89.) Since appellant did not have access to prior complaints about the officers, he was not in a position to know whether the complaints in fact established the custom, habit, intent, motive or plan which he alleged. (Cf. *Pitchess* v. *Superior Court, supra,* 11 Cal.3d at pp. 537-538.) To require specificity in this regard would place an accused in the Catch-22 position of having to allege with particularity the very information he is seeking. Neither the Evidence Code nor *Pitchess* was intended to be applied in this manner.

In sum, under *Pitchess* and the Evidence Code, appellant demonstrated good cause for the requested discovery. The trial court abused its discretion when it summarily denied his motion.[27]

### III.

This court must next determine the consequences of the trial court's ruling. ▮ It is settled that an accused must demonstrate that prejudice resulted from a trial court's error in denying discovery. (*People* v. *Sewell* (1978) 20 Cal.3d 639, 646 [143 Cal.Rptr. 879, 574 P.2d 1231]; *People* v. *Coyer* (1983) 142 Cal.App.3d 839, 843 [191 Cal.Rptr. 376].)

▮ It is clear that prejudice exists in this case. The trial court was required to determine from the evidence presented at the hearing on appellant's motion to exclude the confession whether it was voluntary beyond a reasonable doubt. (*People* v. *Jimenez, supra,* 21 Cal.3d at p. 608.) Since the denial of discovery deprived appellant of the possibility of presenting evidence on that issue, the trial court did not make as informed a determination as it might have if discovery had been granted.[28]

---

[27]The specifics of appellant's discovery request are dealt with in the next section of this opinion.

[28]As noted, evidence of coercion would have been admissible at trial on the question of what weight the trier of fact should have given the confession. (*People* v. *Jimenez, supra,* 21 Cal.3d at p. 607; *Jackson* v. *Denno, supra,* 378 U.S. at p. 386, fn. 13 [12 L.Ed.2d at p. 921].) Obviously, the trial court's failure to accord appellant an opportunity to discover evidence of coercion precluded him from presenting any such evidence as to whether the confession should have been believed, even assuming it was properly admitted.

Moreover, " ' ' "[a]s a reviewing court it is our duty to examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was properly found." ' ' " (*People* v. *Jimenez, supra,* 21 Cal.3d at p. 609.) Under the facts of this case, it is reasonably probable that discovery would have led to admissible evidence of sufficient weight to affect the trial court's determination on the voluntariness of the confession. Thus, reversal of the judgment is required.

The two courts which have found error on appeal in denying an accused *Pitchess* discovery have deemed reversal the appropriate remedy. (*People* v. *Matos, supra,* 92 Cal.App.3d at p. 869; *In re Valerie E., supra,* 50 Cal.App.3d at p. 220.) Therefore, to simply remand for a renewed determination of appellant's discovery motion and the effect, if any, of discovered evidence on the admissibility and weight of the confession would be improper. Although a remand procedure was employed by the Court of Appeal in *People* v. *Coyer, supra,* 142 Cal.App.3d 839, 843-845, that case involved neither *Pitchess* discovery nor discovery relevant to both the admissibility and weight of a confession.

Finally, this court addresses respondent's claim that appellant's discovery request was too broad. In so doing, guidance is given to the trial court for retrial. As will be seen, there is some merit to respondent's claim. ■ As *Pitchess* makes clear, "the right of an accused to obtain discovery is not absolute." (11 Cal.3d at p. 538.)

■ On its face, appellant's request for the identities of all complainants of excessive force was overly broad. Since appellant sought the information to bolster his claim of involuntariness in the interrogation setting, only complaints by persons who alleged coercive techniques in questioning were relevant.

■ In addition, it is necessary to determine whether appellant was entitled to discover information about the 12 officers who were not directly involved in the interrogation. Some Courts of Appeal have restricted discovery to information about the incident which gave rise to the criminal charge. (See, e.g., *Reyes* v. *Municipal Court, supra,* 117 Cal.App.3d 771 [entrapment defense in solicitation for prostitution charge; discovery of identities of individuals arrested by officer on same occasion denied].) In the *Pitchess* context, a few Courts of Appeal have limited discovery to information about the officers directly "involved in the fracas . . . ." (*Hinojosa* v. *Superior Court* (1976) 55 Cal.App.3d 692, 697 [127 Cal.Rptr. 664]; see also *Craig* v. *Municipal Court* (1979) 100 Cal.App.3d 69 [161 Cal.Rptr. 19] [self-defense in resisting arrest and battery case; discovery of

identities of all persons arrested by officers on similar charges during preceding two years denied].)

Other Courts of Appeal have not read *Pitchess* so restrictively. (*Cadena v. Superior Court, supra,* 79 Cal.App.3d at pp. 218-221 [complaints against "all the named participating officers" discoverable]; *Dell M. v. Superior Court, supra,* 70 Cal.App.3d at p. 787 [complaints against officer who acted in concert with arresting officer discoverable]; *Kelvin L. v. Superior Court* (1976) 62 Cal.App.3d 823, 828-829 [133 Cal.Rptr. 325] [complaints against one of detaining officers not involved in altercation discoverable].) In these cases, the courts have reasoned that even though evidence of prior misconduct may not turn out to be admissible, the accused is entitled to any information which may *lead* to relevant evidence on an issue raised by the facts of the case. (*Id.,* at p. 828.)

Appellant's discovery claim was more akin to those advanced in *Cadena, Dell M.,* and *Kelvin L.,* since it alleged both direct and indirect involvement by all the officers in the South Gate Police Department.[29] Moreover, Evidence Code section 1045, subdivision (c) also supported appellant's request for information about the noninterrogating officers. That statute expressly recognizes that "the policies or pattern of conduct of [an] employing agency" may be relevant to "the issue in litigation." (See *ante,* fn. 20.) Counsel's declaration alleged "a continuing course of conduct by the South Gate Police Department which includes extraction of involuntary confessions." Clearly, appellant's purpose in obtaining discovery was to show a "pattern" or "policy" within the department to obtain confessions by unlawful methods. Such a showing could properly be made by evidence of custom or habit (see 2 Jefferson, Cal. Evidence Benchbook, *op. cit. supra,* § 33.8, p. 1267), or by evidence that the officers were engaged in a plan to obtain confessions by such means. (Evid. Code, § 1101, subd. (b).)

However legally sound appellant's theory of discovery of complaints against the 12 noninterrogating officers may have been, there was no foundation to grant it on the evidence before the trial court. Absent a link between any of the noninterrogating and interrogating officers, the relevance of the "policy" or "pattern of conduct" sought to be proven was slight. Therefore, without some showing that any of the noninterrogating officers trained or otherwise had substantial contacts with any of the four interrogating officers, complaints about the former group were not discoverable. Should appellant renew his request for such information, he is required to

---

[29]According to the district attorney, the 16 officers named in appellant's motion comprised "almost the whole [South Gate Police] department."

make such a showing.[30] If evidence of this "link" is not " 'readily obtain[able] . . . through his own efforts' " (*Pitchess* v. *Superior Court, supra,* 11 Cal.3d at p. 537), appellant is entitled to enlist the trial court's aid through a separate motion for discovery.

Several restrictions on discovery—which appear in Evidence Code section 1045—were also applicable. For example, although reports of internal investigations were "once generally permitted under established *Pitchess* principles," their disclosure "is now circumscribed under the statutory scheme." (*Arcelona* v. *Municipal Court, supra,* 113 Cal.App.3d at pp. 530-531.) As Evidence Code section 1045, subdivision (b)(2) now provides, the conclusions resulting from internal investigations of citizens' complaints are excluded from disclosure. (See *ante,* fn. 20.) Thus, appellant was not entitled to such information.

A similar conclusion holds for complaints concerning conduct which occurred more than five years before the interrogation in this case (Evid. Code, § 1045, subd. (b)(1)), or for "[f]acts sought to be disclosed which are so remote as to make disclosure of little or no practical benefit." (*Id.,* subd. (b)(3).) However, complaints regarding conduct which occurred after the interrogation in this case may be relevant to coercion. In the event the motion is renewed below, the trial court should exercise its discretion in this regard. (*Dincau* v. *Tamayose, supra,* 131 Cal.App.3d at pp. 795-796; *People* v. *Shoemaker* (1982) 135 Cal.App.3d 442, 447-449 [185 Cal.Rptr. 370].)

This court must also determine whether discovery of statements of psychiatrists or psychologists contained in the officers' personnel files was proper. (See par. 8, *ante,* fn. 21.) At first blush, this information appears to be protected by the psychotherapist-patient privilege. (Evid. Code, § 1014.)[31] However, no privilege applies "if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger." (Evid. Code, § 1024.)

---

[30]As a preliminary matter, the court should first determine whether information about the "policy" or "pattern of conduct" in the South Gate Police Department "may be obtained from other records maintained by [the department] in the regular course of [department] business which would not necessitate the disclosure of individual personnel records." (Evid. Code, § 1045, subd. (c).)

[31]Evidence Code section 1044 expressly does not affect a party's right of access to a peace officer's psychological records contained in such files if the officer places his mental or emotional condition in issue. (See Evid. Code, §§ 996, 1016; *Selected Legislation, op. cit. supra,* 10 Pacific L.J. at p. 432.) Since none of the officers did so here, appellant's right of access to such records had to be authorized by other provisions of the Evidence Code.

Two Courts of Appeal have dealt with similar discovery requests in the *Pitchess* context. In *Lemelle* v. *Superior Court* (1978) 77 Cal.App.3d 148 [143 Cal.Rptr. 450], a two-justice majority held that the trial court did not abuse its discretion in refusing discovery of records of psychiatric or psychological opinions regarding a propensity for the officers' violence. (*Id.*, at pp. 157-162.) However, the court noted that the accused was "not precluded from presenting to the trial court hereafter any appropriate motion . . . to test the applicability of Evidence Code section 1024 and for an *in camera* inspection of these records if they exist." (*Id.*, at p. 160.)

In *Arcelona* v. *Municipal Court, supra,* 113 Cal.App.3d 523, several individuals were accused of felony offenses in connection with a civil disturbance following the verdicts in the homicide trial of former San Francisco Supervisor Dan White. They sought discovery of psychological test results and performance evaluations which showed the officers' tendency to use excessive force or a tendency toward homosexual bias. (*Id.*, at p. 528, fn. 2.) The court held that the potential probative value of this information for the purpose of demonstrating bias by the officers and self-defense by the accused was "remote and purely speculative." (*Id.*, at p. 531.) The court further held that the privacy rights of the officers outweighed the value of this information to the accused. (*Id.*, at pp. 531-532.)

Beyond appellant's allegations that the records sought would possibly demonstrate the officers' custom for unlawfully extracting confessions, his motion did not specify why the mental health records in particular should have been disclosed. Nevertheless, the position of the petitioners in *Lemelle* and *Arcelona* is a sound one. In an appropriate case, an individual officer's interest in privacy must give way to the accused's need for information relevant to an issue in his case.

As the late Justice Tamura wrote in dissent in *Lemelle,* "the peril to which the public is exposed by a police officer who is suffering from a mental or emotional condition which renders him violence prone or causes him to demonstrate racial bias is a danger of sufficient gravity to justify the invocation of the exception provided by Evidence Code section 1024." (*Lemelle* v. *Superior Court, supra,* 77 Cal.App.3d at p. 168 (dis. opn.).) This statement applies with equal force to officers who allegedly obtain confessions by unlawful methods.

As Justice Tamura suggested in *Lemelle,* the trial court here should order production of the mental health records of the four interrogating officers. As with any of the information which the prosecution is ordered to produce, these records should be examined *in camera.* If the court concludes that the records are not protected by the psychotherapist-patient privilege, they may

be disclosed to appellant in the interests of justice. (Evid. Code, § 1045, subds. (b)(3), (d).) As with any of the information produced under appellant's motion, if the court deems it necessary to protect the officers from "unnecessary annoyance, embarrassment, or oppression" associated with the disclosure of such records, it may fashion an order appropriately directed toward that end. (*Id.*, subd. (d).)[32]

One additional point must be made. Evidence Code section 1040 gives the agency in possession of the requested information a "formal privilege to refuse to divulge official information when the need to maintain its secrecy is greater than the need for disclosure in the interests of justice." (*Pitchess* v. *Superior Court, supra,* 11 Cal.3d at p. 538, fn. omitted.)

No such privilege was claimed here since the trial court denied appellant's motion. Therefore, upon appellant's renewed discovery motion, the South Gate Police Department may seek to establish the applicability of the conditional privilege provided for in Evidence Code section 1040. However, as in *Pitchess,* "the decision on the propriety of such a motion and its possible attendant consequences under Evidence Code section 1042, subdivision (a),[33] will remain in the sound discretion of the trial court . . . ." (*Pitchess* v. *Superior Court, supra,* 11 Cal.3d at p. 540; see also *Kelvin L.* v. *Superior Court, supra,* 62 Cal.App.3d at pp. 830-831; *In re Valerie E., supra,* 50 Cal.App.3d at pp. 219-220.)

### IV.

At the hearing to determine the admissibility of the confession, appellant offered the testimony of 17 witnesses who alleged improper interrogation practices in the South Gate Police Department. Some of the proffered testimony was in specific reference to the use of the interrogation room "hole" as a coercive technique. (See *ante,* pp. 671-673.) In addition, appellant offered the testimony of three deputy public defenders who would have testified that during the two and one-half years preceding appellant's

---

[32]Mental health records of the 12 noninterrogating officers should be produced for an *in camera* inspection only if certain conditions are met: (1) that no other records of the police department will suffice (Evid. Code, § 1045, subd. (c)); (2) that a sufficient "link" between a particular noninterrogating officer and any of the interrogating officers has been demonstrated (see *ante,* at pp. 686-687); and (3) that a particularized showing of need for mental health records has been made. These officers were not directly involved in the interrogation. Therefore, without a particularized showing that mental health records are necessary, their right to privacy should be maintained.

[33]Evidence Code section 1042, subdivision (a) provides in part: "[I]f a claim of privilege under this article by the state or a public entity in this state is sustained in a criminal proceeding, the presiding officer shall make such order or finding of fact adverse to the public entity bringing the proceeding as is required by law upon any issue in the proceeding to which the privileged information is material."

arrest, the public defender's office had not received any *"Miranda* calls" (see *ante,* fn. 14) from the South Gate Police Department.

Since the admissibility of such testimony is likely to be an issue in the event of a retrial, it is appropriate to guide the trial court in ruling on this motion.

As to the testimony of witnesses interrogated by the four officers who also participated in appellant's interrogation, the trial court should, as it did below, permit such testimony. However, whether the testimony from witnesses interrogated by the 12 "noninterrogating" officers is admissible will depend on whether appellant has demonstrated a link between any of those officers and the 4 "interrogating" officers. (See *ante,* at pp. 686-687.) Once such a link is established, the testimony should be admitted, since neither Evidence Code section 352 nor any other provision of law would prohibit it. (See *People* v. *Castain, supra,* 122 Cal.App.3d at pp. 142-143.) Such evidence may be presented on the question of whether the confession is admissible as well as on what weight the trier of fact should give it. (*People* v. *Jimenez, supra,* 21 Cal.3d at p. 607.)

## V.

Appellant also contends that the prosecution failed to prove (1) premeditation and deliberation as to the Carl Jr. homicide and (2) malice as to all three of the homicides. These omissions, it is argued, require reduction of the court's murder verdicts to voluntary manslaughter and reversal of the associated sentences. In view of the judgment of reversal on other grounds, it is unnecessary to determine whether reduction of the verdicts is required. However, double jeopardy principles require this court to address appellant's sufficiency claim to determine the propriety of murder charges in the event of a retrial. (*Burks* v. *United States* (1978) 437 U.S. 1, 16-18 [57 L.Ed.2d 1, 12-14, 98 S.Ct. 2141]; cf. *People* v. *Green, supra,* 27 Cal.3d 1, 62.)

In his confession, appellant explained that at approximately 6:30 p.m. on Sunday, October 22, 1978, he had gone to a restaurant for supper but found the line too long. Since the restaurant was near Carl Sr.'s home, he decided to stop in and ask Carl Sr. to do some repair work on his car.

Appellant drove to Carl Sr.'s home and parked. As he was leaving the car, Carl Jr. rode up on his bicycle. The boy told appellant not to tell his father that he (Carl Jr.) was home because his father would make him go inside. Carl Jr. said that "he would like to have a Coke or that he was going

for a Coke." Appellant offered to take him, and they both got into appellant's car.

Appellant drove directly to his residence. Appellant "had it in the back of his mind he was going to try to take some pictures of [Carl Jr.] in the nude because that is how he got his sexual satisfaction, photographying [*sic*] young boys in the nude." Appellant took the boy into his bedroom and turned on some fancy strobe lights. The lights seemed to fascinate the boy, who stood watching them for five or ten minutes.

Suddenly, Carl Jr. said he had to return home as it was getting late and his father would be worried. This "sort of pissed [appellant] off," for "he hadn't even offered [Carl Jr.] a Coke or he hadn't even asked for one." Appellant told Detective Carter that "the next thing he knew he grabbed this clothesline he had on the nightstand adjacent to his bed, put it around [Carl Jr.'s] neck and strangled him." Appellant remembered tying a square knot in the line, and taping the boy's hands behind his back with masking tape. However, he did not indicate at what point he tied the knot and could not recall when he taped Carl Jr.'s hands.

Appellant suddenly "realized that [Carl Jr.] was dead." Appellant then disrobed, removed all of Carl Jr.'s clothes except for his T-shirt, and placed the body on the bed. He attempted anal intercourse but was unable to achieve an erection.

Appellant got dressed and went into the front room. He then "became quite concerned over what had happened" and thought he needed an alibi so he decided to take his car to be repaired by Carl Sr. He telephoned Helen J. and asked her to follow him to Carl Sr.'s home and to drive him back. She agreed to help appellant at the conclusion of a television show she was watching.

A short while later, 15-year-old Andreas G. dropped by. Appellant showed him slides of naked women in the living room until Andreas' brother and sister arrived to bring him home. Before leaving, Andreas helped appellant start his car. Appellant then waited by his car for Helen J. for he did not want her to go up to the apartment.

Helen J. arrived shortly after 10 p.m. and followed appellant to Carl Sr.'s residence where appellant left his car. She then dropped appellant at his apartment and drove home.[34]

---

[34]Appellant's statements as to his contacts with Helen J. and members of Carl Jr.'s family accorded with their subsequent testimony.

Appellant did not know what to do with Carl Jr.'s body. He recalled that he had once taken cars to an auto auction in the San Gabriel area where he might be able to dispose of the body. Appellant cut the extra clothesline from the loop that was around the boy's neck, wrapped the body and most of the boy's clothing in a blanket, and placed the body in the rear of his Plymouth. Appellant drove around until he found a dark area and dumped the body and clothing over an embankment. He then returned home, "got real sick" and "threw up."

The following day appellant realized he still had the boy's shoes and socks, so he put them in a suitcase in the garage. Appellant told Detective Carter that these items, as well as the remaining clothesline, the masking tape, and the blanket, were still at his apartment.[35] Appellant later led the officers to the location of the body.[36]

An autopsy was performed on Carl Jr.'s body by Dr. Joseph Choi, a deputy medical examiner from the coroner's office. The cause of death was strangulation. Because death had occurred five days prior to recovery of the body, it was markedly decomposed. As a result, it was "difficult to tell" whether there had been sexual contact with the victim around the time of his death. There were some abrasions around the anus, but Choi was unable to determine how or when they had been made. Tests run on anal smears produced a "two plus positive" result for acid phosphatase. According to Dr. Choi, these results suggested the likely presence of semen.[37] However, the tests disclosed no sperm the presence of which would be expected in semen that came from a normal adult male.

Upon confessing to killing Carl Jr., appellant "broke down." After being calmed, appellant confessed to two other killings which had occurred about two years earlier in a park in Bell Gardens.

Appellant said he was at the park photographing some boys playing soc-cer. As darkness approached, two boys walked up to a pond with fishing poles. Appellant watched the boys for a while, then walked over and struck

[35]Some of these items were subsequently recovered from the apartment. Also recovered were several photographs of young, naked boys. Detective Carter recognized some of these boys as individuals he had interviewed earlier in the day. (See *ante,* fn. 7.)

[36]When discovered, Carl Jr.'s body was clad only in a T-shirt. His jeans and underwear were nearby. There was a cord around his neck, the ends fastened with a "granny knot." His hands were not bound.

[37]Dr. Choi's testimony regarding the acid phosphatase test was somewhat confusing. At the preliminary hearing, Choi stated that there were no foreign substances "of a remarkable nature" in the anus. At trial, however, he insisted that the acid phosphatase test had dem-onstrated "a strong possibility" of seminal fluid in the anus. He maintained that this was "basically the same thing" he had testified to at the preliminary hearing.

up a conversation. The three talked until late at night, while the boys fished. At times, appellant "hinted about sex to the boys," especially to the blond boy, Scott F., toward whom appellant was attracted.[38] Appellant felt he could not make advances toward Scott as long as Ralph was there.

At some point Ralph fell asleep, and appellant suggested to Scott that they walk to the other side of the pond. Scott agreed, and they began walking. About half way around the pond, Scott called appellant something like a "faggot" or a "fucking faggot." Appellant became "pissed off," pulled out a two-and-one-half-inch knife, and slit Scott's throat.

Appellant started running back toward his motorcycle, covered with blood and still carrying the knife. Ralph, the other boy, awoke and started screaming. Appellant "had to do something," as he realized Ralph would recognize him. He slit Ralph's throat. He then jumped on his motorcycle and fled.[39]

Finally, there was uncontradicted testimony by a psychiatrist, Dr. Michael B. Coburn.[40] He was called by the defense to establish that the killings—particularly those of Carl Jr. and Scott F.—were committed by appellant during a fit or a rage and thus were not deliberate and premeditated.

According to Dr. Coburn, appellant did not appear to have either a true psychosis or organic brain syndrome, and he seemed to have an above-average intellectual capacity. However, he did have a severe personality disorder, a condition which probably began in childhood and was deteriorating with the passage of time.

Coburn diagnosed appellant as a homosexual pedophile. Appellant was not a normal "conflict-free" homosexual, but had been affected by an "abysmally low self image and problems with terrible insecurity and feelings of rejection." Consequently, appellant felt a need to be in control and had had for much of his life "fantasies of being in a power position, even to the point of being in control of a dead individual, of a deceased person who could, therefore, in his words 'not laugh at me.'" Appellant's need to be in control had given rise to a sexual interest in children and in bondage.

Normally, Dr. Coburn testified, these feelings would characterize appellant as a disturbed individual with severe sexual and emotional disorders

---

[38]According to a coroner's report, Scott was 12 years old but looked somewhat younger. The other boy, Ralph C., was 10 years old but appeared slightly older.

[39]A coroner's report indicated that Scott F. and Ralph C. died as the result of cutting wounds to the neck.

[40]The parties stipulated that Dr. Coburn was qualified to testify as a psychiatric expert.

who would lead a generally isolated, withdrawn life. However, "superimposed" on appellant's general state of mind were occasional uncontrollable explosions of rage or panic.

Appellant would develop an inner tension, probably related to a desire to have a sexual experience, and would lose control "much more easily than when he is in a sexually quiescent mode of life." According to Dr. Coburn, when in this explosive state, appellant was probably incapable of premeditation and deliberation or of conforming his behavior to the law.

Dr. Coburn opined that it was likely that appellant had been in such an explosive, uncontrollable state when he killed Carl Jr., that "suddenly he was driven from his inner drives beyond that point of merely being in control or having sex and committed the homicide." Although Coburn believed appellant had a sexual motivation for bringing the boy to his apartment, the "trigger" for the homicidal explosion was the boy's sudden request to leave. This conclusion was reinforced by appellant's statement to Coburn that Carl Jr. "was scared, he was afraid of me, it was like laughing."

Similarly, Coburn believed that the killing of Scott F. in 1976 was probably set off by the victim's derogatory remarks. However, the Ralph C. killing did not fit the pattern of an uncontrollable act since it was done to eliminate a witness to the first killing. It appeared to be a thinking, premeditated act.[41]

Coburn conceded that his conclusions about appellant's probable states of mind were more speculative than he would have preferred, and opined that appellant's "need to be in control" had affected the interviews. He felt that he never "got through" to appellant and that appellant was never "really totally honest" with him. Nevertheless, Coburn testified, there was sufficient data to support his conclusions. Indeed, appellant's efforts to control the interview situation, Coburn believed, fit within the pattern of appellant's previous behavior.

The standards for appellate review of a sufficiency of evidence claim are well settled. ■■■ " 'The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt. [Citation omitted.] The appellate court must determine whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a

---

[41]Dr. Coburn based his conclusions on (1) approximately four hours of interviews with appellant, (2) a report on the results of a number of psychological tests, which were administered at Coburn's request by a psychologist, and (3) the preliminary hearing transcript.

reasonable doubt.'" (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1265], quoting *People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649]; see *People* v. *Arcega* (1982) 32 Cal.3d 504, 518 [186 Cal.Rptr. 94, 651 P.2d 338].)

 "In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court 'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations.] The court does not, however, limit its review to the evidence favorable to the respondent. . . . '[O]ur task . . . is twofold. First, we must resolve the issue in the light of the *whole record*— i.e., the entire picture of the defendant put before the jury—and may not limit our appraisal to isolated bits of evidence selected by the respondent. Second, we must judge whether the evidence of each of the essential elements . . . is *substantial;* it is not enough for the respondent simply to point to "some" evidence supporting the finding, for "Not every surface conflict of evidence remains substantial in the light of other facts."'" (*People* v. *Johnson, supra,* 26 Cal.3d at pp. 576-577, citations omitted.)

Finally, although reasonable inferences must be drawn in support of the judgment, this court may not "go beyond inference and into the realm of speculation in order to find support for a judgment. A finding of first degree murder which is merely the product of conjecture and surmise may not be affirmed." (*People* v. *Rowland* (1982) 134 Cal.App.3d 1, 8-9 [184 Cal.Rptr. 346]; *People* v. *Anderson, supra,* 70 Cal.2d at p. 25.)

The parties focus only on the evidence of premeditation and deliberation in their discussion of the sufficiency of the evidence to support the Carl Jr. first degree murder verdict. However, this court need not determine whether the evidence was sufficient on that theory, since substantial evidence supports the verdict on a felony-murder (attempted lewd or lascivious conduct (§ 288)) theory.[42]

Before addressing the merits of the felony-murder issue, the threshold issue of whether review of the verdict on felony-murder grounds is proper must be resolved. As the procedural facts indicate (see *ante,* p. 665), the information alleged two special circumstances: (1) that appellant had suffered a murder conviction in the same proceeding, and (2) that the Carl Jr. murder was wilful, deliberate and premeditated, and had occurred in the commission or attempted commission of a lewd or lascivious act in violation

---

[42]Neither party has briefed this question, although appellant does state, without further explanation, that such a theory was not applicable in this case.

of section 288. (Former § 190.2, subds. (c)(5)(cl. 1) & (c)(3)(iv).) Following the presentation of the evidence, the trial court rendered its guilty verdicts, found the special circumstance based on felony murder not true, and found the multiple murder special circumstance to be true. The court did not explain how it arrived at its verdicts or findings.

A felony-murder special circumstance allegation under the 1977 death penalty law required not only that the murder be "committed during the commission or attempted commission of [one of several enumerated felonies]," but also that the murder be "willful, deliberate, and premeditated . . . ." (Former § 190.2, subd. (c)(3).)[43] The trial court could have found this allegation untrue because of insufficient evidence of a felony murder or because of insufficient evidence of wilfulness, deliberation, and premeditation. Because of this latter possibility, the court's finding on the special circumstance did not necessarily imply that its earlier first degree murder verdict was not premised on felony-murder principles.

The record does contain a suggestion—albeit rather oblique—that the trial court's special circumstance finding was based on insufficient evidence to establish a violation or attempted violation of section 288.[44] However, the ambiguity of the record in this regard precludes this court from sustaining such a suggestion. Therefore, no bar appears to analyzing appellant's sufficiency argument on a felony-murder theory.

As section 189 makes clear, "All murder . . . which is committed in the . . . attempt to perpetrate . . . any act punishable under Section 288, is

[43]In sharp contrast, the parallel 1978 provision requires only that "[t]he murder [have been] committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit [certain enumerated felonies]," or was an aider or abettor in such conduct. (§ 190.2, subds. (a)(17) & (b).) In Carlos v. Superior Court (1983) 35 Cal.3d 131, 153 [197 Cal.Rptr. 79, 672 P.2d 862], this court construed this provision to require that the trier of fact also find that the accused intended to kill or aid in a killing, a requirement short of premeditation and deliberation.

[44]There was only scant discussion of a lewd conduct theory during the arguments of counsel. In his closing argument, the prosecutor insisted that the killing had been "a thinking, planned, deliberate act." However, in his rebuttal argument, the prosecutor noted that if the killing had been a "continuing process" of appellant's act of tying Carl Jr.'s hands, "then [it] was in the commission of the lewd act."

In making its finding on the felony-murder special circumstance allegation, the trial court stated only that "the special circumstance allegation as to [the Carl Jr. murder] relating to the fact that the murder was committed during the commission or attempted commission of a lewd and lascivious act upon the person of [Carl Jr.] in violation of Section 288 of the Penal Code [is] not true." As is evident, the court failed to mention the premeditation and deliberation component of the special circumstance allegation. Thus, although the record suggests that the trial court believed the evidence of lewd or lascivious conduct to be less than convincing, it failed to unequivocally so indicate.

murder of the first degree."[45] The elements of a section 288 offense are: "(1) a lewd or lascivious act, that is, an act which is lustful, immoral, seductive or degrading; (2) the commission of such act upon the body, or any part thereof, of a child under 14 years of age; and (3) [commission of the act] with the intent of arousing or appealing to the lust or sexual desires of the accused or the child." (*People* v. *Webb* (1958) 158 Cal.App.2d 537, 542 [323 P.2d 1411].)

In this case, there is little doubt that appellant possessed the requisite lewd intent. As appellant's confession indicates, his purpose in taking Carl Jr. to the apartment was to eventually take pictures of him in the nude.[46] As appellant told the officers, this was to be done to achieve sexual satisfaction. Thus, if any of the *acts* confessed to provided substantial evidence of an attempted violation of section 288, there was sufficient evidence to support the verdict on felony-murder grounds.[47]

Since the decisional law is somewhat sparse on the question of the kinds of acts necessary to constitute an attempt to violate section 288,[48] resort

---

[45]At the time of the Carl Jr. killing, section 288 provided in part: "Any person who shall willfully and lewdly commit any lewd or lascivious act including any of the acts constituting other crimes provided for in Part 1 of this code upon or with the body, or any part or member thereof, of a child under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of such person or of such child, shall be guilty of a felony . . . ." (See Stats. 1976, ch. 1139, § 177, pp. 5110-5111.)

[46]It should be noted that notwithstanding the absence of independent proof of the corpus delecti of the felony, the trial court could properly have considered the confession in determining whether an attempted violation of section 288 had been established. (*People* v. *Cantrell* (1973) 8 Cal.3d 672, 680-681 [105 Cal.Rptr. 792, 504 P.2d 1256].)

[47]It is true that appellant confessed to committing an act of sodomy on Carl Jr.'s body— an act which constitutes a violation of section 286 as well as section 288. However, his confession placed that act *after* the killing. Moreover, Dr. Choi's testimony was inconclusive as to when sexual contact, if any, took place. Because of the badly decomposed state in which the body was found, Choi was unable to fix the time of death. Therefore, the timing of any sexual contact was even less certain. Also it is significant that after the preliminary hearing and without objection by the prosecution, the trial court dismissed a sodomy count which had been alleged in the complaint. Thus, the record strongly suggests that sodomy did not furnish a basis for a felony-murder conviction.

[48]There are very few appellate decisions involving attempted section 288 violations. In *People* v. *LaFontaine* (1978) 79 Cal.App.3d 176 [144 Cal.Rptr. 729], Justice Jefferson held that the act of soliciting a young hitchhiker to perform a lewd act did not constitute an attempt to violate section 288. (*Id.*, at pp. 180-183.) In that case, the boy entered the automobile, but no touching took place. (*Id.*, at p. 180.) The court reversed the attempted lewd conduct conviction, but affirmed an associated conviction for child molesting (§ 647a; 79 Cal.App.3d at pp. 182-183, 185, 187.)

And, in *People* v. *Granados* (1957) 49 Cal.2d 490, 497 [319 P.2d 346] the evidence showed (1) that the accused had asked his young victim, the decedent, whether she was a virgin, (2) that although her apron had been pulled below her genitals, her skirt "was considerably above them," and (3) that there was no laceration, contusion, or sperm on the victim's genitals. Justice McComb, writing for the majority, found this evidence insufficient to support a violation or attempted violation of section 288. Justice Spence dissented, opining

must be had to traditional definitions of the crime of attempt. ▮ "It is settled that an attempt to commit a crime is compounded of two elements, viz., intent and a direct ineffectual act done toward its commission. It is equally well settled that there is a material difference between the preparation antecedent to an offense and the actual attempt to commit it. The preparation consists of devising or arranging the means or measures necessary for the commission of the offense, while the attempt is the direct movement toward its commission after the preparations are made. In other words, to constitute an attempt the acts of the defendant must go so far that they would result in the accomplishment of the crime unless frustrated by extraneous circumstances. [Citations.]" (*People* v. *Werner* (1940) 16 Cal.2d 216, 221-222 [105 P.2d 927]; see also 1 Witkin, Cal. Crimes, § 93 et seq.)

▮ This court has also noted that an attempt, as distinguished from acts preparatory to that offense, requires "some appreciable fragment of the crime . . . accomplished." (*People* v. *Gallardo* (1953) 41 Cal.2d 57, 66 [257 P.2d 29]; *People* v. *Buffum* (1953) 40 Cal.2d 709, 718 [256 P.2d 317].) However, "[a]n overt act need not be the ultimate step toward the consummation of the design; it is sufficient if it is the first or some subsequent act directed towards that end after the preparations are made." (*People* v. *Fulton* (1961) 188 Cal.App.2d 105, 116 [10 Cal.Rptr. 319]; see *People* v. *Lyles* (1957) 156 Cal.App.2d 482 [319 P.2d 745]; *People* v. *Gibson* (1949) 94 Cal.App.2d 468 [210 P.2d 747].)

Some Courts of Appeal have suggested focusing on the accused's intent rather than on the degree to which the acts go beyond "mere preparation." Thus, "[w]henever the design of a person to commit a crime is clearly shown, slight acts done in furtherance of that design will constitute an attempt, and the courts should not destroy the practical and common-sense administration of the law with subtleties as to what constitutes preparation and what constitutes an act done toward the commission of a crime." (*People* v. *Fiegelman* (1939) 33 Cal.App.2d 100, 105 [91 P.2d 156]; *People* v. *Von Hecht* (1955) 133 Cal.App.2d 25, 38-39 [283 P.2d 764]; see *People* v. *Anderson* (1934) 1 Cal.2d 687, 690 [37 P.2d 67].) A majority of this court

---

that "it may be reasonably inferred . . . that defendant's acts immediately preceding the killing were sex motivated, and that the murder was committed when the girl repulsed defendant's attempts to commit lewd acts . . . ." (*Id.*, at p. 500 (dis. opn.).)

However, in *People* v. *Worthington* (1974) 38 Cal.App.3d 359 [113 Cal.Rptr. 322], the court found no error in giving felony-murder instructions based on an attempted violation of section 288. The evidence indicated that just two days before the killing, the victim's mother had ordered the accused out of the victim's bedroom because, in her words, he was "trying to go down on my daughter." This fact, when combined with the "extremely weak" medical testimony indicating the presence of foreign blood cells in the victim's anus, permitted the jury to find that the killing of the daughter had occurred *during an attempt to violate section 288*. (*Id.*, at pp. 366-368.)

recently approved this line of cases in *People* v. *Dillon* (1983) 34 Cal.3d 441, 455 [194 Cal.Rptr. 390, 668 P.2d 697]. (Lead opn. of Mosk, J.)

Of course, none of the various "tests" used by the courts can possibly distinguish all preparations from all attempts. Nevertheless, if appellant's entire course of conduct is evaluated in light of his confessed intent and his prior history, there was substantial evidence from which a reasonable trier of fact could have sustained a finding of an attempt to commit lewd or lascivious conduct.

In his confession, appellant indicated that he invited Carl Jr. to the apartment for a Coke. The invitation was probably a ruse for other contemplated activity, since appellant indicated that he "had in the back of his mind" that he would try to take pictures of the boy in the nude.

Once inside, appellant took Carl Jr. into the bedroom, turned on "black strobe lights," and sat down on the bed. The boy stood adjacent to the bed, watching the lights blink on and off. Suddenly, when Carl Jr. announced his departure, appellant became angry, grabbed the clothesline and strangled him. Although appellant confessed to binding Carl Jr.'s hands, he was unable to remember whether he tied the boy's hands before strangling him, and no independent evidence established the timing of that act.

No specific "plan" vis-à-vis Carl Jr. had been formulated. Nevertheless, the "arrangement" of lights, pornographic materials and other paraphernalia in appellant's apartment would suggest sufficient planning to enable appellant to commit lewd conduct once a willing participant came along.

It is true that the simple act of accompanying Carl Jr. up to appellant's apartment probably fell within the "zone of preparation." However, appellant went beyond preparation. He ushered the boy into the bedroom to watch the strobe lights and stayed close by. These were steps which furthered his aim of readying Carl Jr. for a nude photography session which was, in all likelihood, intended to culminate in lewd conduct. These acts, therefore, constituted the "actual commencement of his plan" and were sufficient to support an attempt. (*People* v. *Staples* (1970) 6 Cal.App.3d 61, 68 [85 Cal.Rptr. 589].) But for Carl Jr.'s abrupt decision to leave the apartment, it is likely that these steps would have resulted in a completed violation of section 288. (*People* v. *Werner, supra,* 16 Cal.2d at pp. 221-222.) Viewing the evidence in this light, this court cannot say that the trial court's first degree murder verdict was not supported by substantial evidence of attempted lewd or lascivious conduct under a felony-murder theory.

 Appellant has also advanced an insufficiency claim with respect to malice in all three murder convictions. As to the Carl Jr. killing, resolution

of this claim is unnecessary, since the verdict rests on sufficient evidence under felony murder. (*People* v. *Dillon, supra,* 34 Cal.3d at p. 477, fn. 24.) As to the 1976 Bell Gardens killings, the contention must fail.

Section 188 provides that malice "is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." The latter phrase "has been construed to be that state of mind '[w]here the defendant for a base, antisocial purpose, does an act which involves a high degree of probability that it will result in death' . . . with wanton disregard for human life . . . ." (*People* v. *Poddar* (1974) 10 Cal.3d 750, 757 [111 Cal.Rptr. 910, 518 P.2d 342], citations omitted.)

The record contains sufficient evidence of malice under this formulation. While the Scott F. homicide was probably a reaction to the boy's name calling, the provocation was far from "considerable," and appellant's use of a knife to cut Scott's throat exhibited the requisite wanton disregard for human life. In reaching its verdict on that count, the trial court was, of course, free to reject defense expert testimony to the contrary. (*People* v. *Cruz, supra,* 26 Cal.3d at p. 249.) As to the Ralph C. killing, the evidence strongly suggests that appellant deliberately intended to kill to eliminate the only person who could link him to Scott's killing. Even the defense expert's testimony that this killing appeared to be a "thinking, premeditated act" came close to acknowledging the presence of malice as to this homicide. The finding of malice in both incidents is more than supported by substantial evidence.

There is sufficient evidence to support the trial court's verdicts on the three homicide counts. Therefore, double jeopardy principles do not bar reprosecution of appellant for second degree murder on the Scott F. charge, and for first degree murder on the Carl Jr. and Ralph C. charges.

## VI.

■■■ Appellant contends that the trial court erred in failing to obtain a separate waiver of jury on the trial of the special circumstances allegation. Because this issue is an important one likely to arise not only on retrial in this case but in many cases under both the 1977 and 1978 death penalty laws, it is addressed here.

The 1977 death penalty law, like its 1978 counterpart, sets forth a procedure for the trial of guilt and special circumstance allegations. Former section 190.1, subdivision (a) provided in part that "[t]he defendant's guilt

shall first be determined. If the trier of fact finds the defendant guilty of first degree murder, it shall *at the same time* determine the truth of all special circumstances charged . . . ." (Italics added.)

The 1977 legislation also anticipated situations in which guilt had been determined by a court sitting without a jury. Thus, "[i]f the defendant was convicted by the court sitting without a jury, the trier of fact [on the special circumstance allegation(s)] shall be a jury unless a jury is waived by the defendant and by the people, in which case the trier of fact shall be the court." (Former § 190.4, subd. (a).)[49]

It is apparent that an inherent conflict exists between these two statutes. As the Court of Appeal in *People* v. *Granger* (1980) 105 Cal.App.3d 422, 427-428 [164 Cal.Rptr. 363] explained, "where . . . a jury has . . . been waived as to the guilt[] phase of the case, it is . . . impossible to comply with the requirements of section 190.4, that the special circumstances be tried by a jury, and also comply with the requirement of section 190.1 that the guilt and special circumstances be determined 'at the same time.'"

*Granger* held that the conflict could be resolved "only by ignoring one of the two statutory provisions." (*Id.*, at p. 428.) The court held that the provision in section 190.4 should prevail and that a personal waiver of jury on a special circumstance allegation was required. (*Id.*, at p. 427.) Since the court was unable to conclude "beyond a reasonable doubt[] that a jury could not rationally have found in defendant's favor on the issue of special circumstances," the accused was held entitled to a jury trial on the special circumstance allegations. (*Id.*, at p. 429.)

The Attorney General contends that *Granger* is wrongly decided. In his view, the appropriate manner to resolve the statutory conflict is to require a separate jury waiver only where "proof of the special circumstance charge consisted of evidence which would not necessarily have been presented on the question of guilt . . . ." A separate jury waiver would still be required, he recognizes, for a "murder conviction in a prior proceeding" special circumstance allegation (former § 190.2, subd. (c)(5)(cl. 2), now § 190.2, subd. (a)(2)), since that allegation is tried separately from the question of guilt and is expressly excepted from the "determine at the same time"

---

[49]The corresponding provisions of the present death penalty law (§§ 190.1, subd. (a), 190.4, subd. (a)) are identical to those in the 1977 statute.

directive of section 190.1, subdivision (a).[50] However, he argues that a separate jury waiver is unnecessary and section 190.4, subdivision (a) should not be given mandatory effect where the proof of a special circumstance allegation rests on evidence presented at trial on the murder charge.

The most obvious flaw in the Attorney General's argument is that the scope of section 190.4, subdivision (a)'s application could not be clearer. Unlike section 190.1, subdivision (a), whose "same time" language applies to all special circumstances except the prior murder conviction special circumstance, the jury trial provision in section 190.4, subdivision (a) contains *no* limitations on the special circumstances which come within its ambit.[51] Had the Legislature intended to limit section 190.4, either to the prior murder conviction special circumstance or to any other special circumstance, it is likely that it would have done so in a manner which was consistent with the limitation in section 190.1. Its failure to do so militates strongly against this court acting in its stead.

Moreover, it is well established that courts are "exceedingly reluctant to attach an interpretation to a particular statute which renders other existing provisions unnecessary." (*Bowland* v. *Municipal Court* (1976) 18 Cal.3d 479, 489 [134 Cal.Rptr. 630, 556 P.2d 1081].) By the same token—and especially where no limitations have been imposed by the Legislature—the courts should not construe statutes in a manner which would severely restrict their application. Since the Attorney General's interpretation would render the jury trial guarantee in section 190.4, subdivision (a) meaningless in many special circumstance cases, this court should not accept such an interpretation in the absence of clear legislative direction.[52]

---

[50]Former section 190.1, subdivision (a) provided in part: "If the trier of fact finds the defendant guilty of first degree murder, it shall at the same time determine the truth of all special circumstances charged as enumerated in Section 190.2 *except* for a special circumstance charged pursuant to paragraph (5) of subdivision (c) of Section 190.2 *where it is alleged that the defendant had been convicted in a prior proceeding of the offense of murder of the first or second degree.*" (Italics added.) With the exception of a change in the numbering of the prior murder conviction special circumstance, the corresponding provision in the 1978 law is identical to that in the 1977 law. (§ 190.1, subd. (a).)

[51]Even if the Legislature's preference for jury waiver on special circumstance allegations could be characterized as ambiguous, it is well settled that an accused is entitled to the interpretation which is most favorable to him. (*People* v. *Davis* (1981) 29 Cal.3d 814, 828 [176 Cal.Rptr. 521, 633 P.2d 186].) This principle would compel recognition of a separate jury waiver requirement in this case.

[52]*People* v. *Berutko* (1969) 71 Cal.2d 84 [77 Cal.Rptr. 217, 453 P.2d 721], upon which the Attorney General relies, is inapposite. There, the appellant contended that his jury waiver as to the substantive charge was insufficient to encompass his jury trial right on the truth of an alleged prior conviction. In rejecting the claim, this court noted that " '[T]he whole spirit and intent of these [Penal Code] statutes [§§ 969½, 1025, 1158] appears to be that a prior conviction charge is to be determined solely as one of the issues in the trial for the new offense. . . . It is settled that where a defendant waives a jury trial he is deemed to

Several of this court's decisions strongly suggest that for jury waiver purposes, special circumstance allegations should be accorded the same deference as charges of substantive offenses. In *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], Justice Broussard observed that this court has "noted the resemblance between a special circumstance proceeding and a trial to determine guilt." (*Id.*, at p. 551.) As this court stated in *People* v. *Superior Court (Engert)* (1982) 31 Cal.3d 797 [183 Cal.Rptr. 800, 647 P.2d 76], "[i]n the California scheme the special circumstance is not just an aggravating factor: it is a fact or set of facts, found beyond a reasonable doubt by a unanimous verdict (Pen. Code, § 190.4), which changes the crime from one punishable by imprisonment of 25 years to life to one which must be punished either by death or life imprisonment without possibility of parole. The fact or set of facts to be found in regard to the special circumstance is no less crucial to the potential for deprivation of liberty on the part of the accused than are the elements of the underlying crime which, when found by a jury, define the crime rather than a lesser included offense or component." (*Id.*, at p. 803, fn. omitted; see *People* v. *Garcia, supra*, 36 Cal.3d at pp. 551-552.)

It was upon this reasoning that *Engert* applied the standards of specificity applicable to criminal statutes to special circumstances. (31 Cal.3d at p. 803.) On similar reasoning, the Court of Appeal in *Ghent* v. *Superior Court* (1979) 90 Cal.App.3d 944 [153 Cal.Rptr. 720] held that a special circumstance allegation, like a criminal charge, is subject to a motion to set aside the information under section 995. And, in *Ramos* v. *Superior Court* (1982) 32 Cal.3d 26, 32-33 [184 Cal.Rptr. 622, 648 P.2d 589], this court approved the *Ghent* holding and extended its reasoning to hold that a special circumstance allegation, like a criminal charge, may be dismissed for insufficient evidence at the conclusion of a preliminary hearing. (*Id.*, at p. 34.)

In *Garcia*, Justice Broussard observed that "[i]n view of the importance of a special circumstance finding, we do not believe the courts can extend a defendant less protection with regard to the elements of a special circumstance than for the elements of a criminal charge."[53] (*People* v. *Garcia,*

have consented to a trial of all of the issues in the case before the court sitting without a jury.' " (*Id.*, at p. 94, citations omitted.)

The *Berutko* court, of course, was not called upon to interpret two contradictory provisions of the special circumstances legislation. Of the statutes under review in *Berutko*, one (§ 969½) was enacted in 1935 and has remained unchanged. The other two were last amended in 1951. Obviously, their "spirit and intent" could not possibly determine whether a separate jury waiver is necessary for special circumstance allegations in death penalty legislation enacted several decades later.

[53]*Garcia* involved retroactivity and prejudice questions under our recent opinion in *Carlos* v. *Superior Court, supra*, 35 Cal.3d 131. Neither question is directly applicable to the issue raised here.

*supra,* 36 Cal.3d at p. 552.) Consistent with this observation and with the reasoning in *Engert, Ghent,* and *Ramos,* this court holds that an accused whose special circumstance allegations are to be tried by a court must make a separate, personal waiver of the right to a jury trial.

This rule is unlikely to have any dramatic effect on the manner in which guilt and special circumstance allegations are tried in the courts of this state. Assuming an accused desires to waive his right to a jury as to both the guilt and special circumstance determinations, the trial court could satisfy section 190.4, subdivision (a)'s requirement by taking separate waivers as to each before commencement of trial.

Even if an accused elects to waive jury on the question of guilt but to exercise that right as to the special circumstance allegations, it is not likely that such a trial will be overly time consuming. For example, in Briggs Initiative cases, where a prior murder conviction or a "murder in the same proceeding" special circumstance is alleged, proof of the allegation is likely to be a pro forma exercise. In such cases, proof that the accused suffered the conviction will suffice.[54] With other special circumstance allegations, proof of only one or a few facts associated with the evidence already presented at trial will be required. (See, e.g., § 190.2, subds. (a)(7) and (8) [victim a peace officer; defendant intentionally killed and knew or reasonably should have known peace officer status]; (a)(11) and (12) [victim a prosecutor or judge; defendant killed in retaliation for or to prevent performance of official duties].)

In this case, the record is clear that the trial court erred in failing to take a personal jury waiver on the multiple murder special circumstance allegation.[55] However, since the judgment must be reversed on other grounds, it

---

[54]In contrast to the 1977 law, multiple murder special circumstance allegations under the 1978 law require only that the defendant have previously been convicted of first or second degree murder, or that he have, in the present proceeding, been convicted of more than one offense of first or second degree murder. (§ 190.2, subds. (a)(2) & (3).)

[55]The only colloquy which occurred before the court considered the truth of the allegation was as follows:

"[DEPUTY DISTRICT ATTORNEY]: I would stipulate that the testimony heretofore offered is the only evidence that we would—that is to be considered by the Court, as I understand the law. We will offer no additional evidence.

"THE COURT: Mr. [defense counsel]?

"[COUNSEL]: We have no additional evidence.

"[THE COURT]: Would you join in the stipulation that we can proceed with the determination?

"[COUNSEL]: Yes.

"THE COURT: The Court finds that the—

"(Counsel and appellant confer *sotto voce.*)

"[COUNSEL]: So stipulated, Your Honor.

"THE COURT: All right. The parties having stipulated that this Court may proceed with the matter as to the second special allegation as to Count III of the Information . . . ."

is unnecessary to determine whether appellant was prejudiced by that error. The question as to what standard of prejudice should be applied in this situation is left for another day.

## VII.

The trial court erred in summarily denying appellant's discovery motion. This error requires a reversal of the guilt, special circumstance, and penalty phase verdicts. On retrial, if appellant elects to waive jury on the multiple murder special circumstance allegation, the trial court must take a separate and personal waiver from appellant.

The judgment of the superior court is reversed.

Mosk, J., Broussard, J., and Reynoso, J., concurred.

**GRODIN, J.,** Concurring and Dissenting.—I concur in the majority's holding that the trial court erred in denying appellant's discovery motion. I withhold my approval, however, from that portion of the majority opinion pertaining to the discovery of psychiatric or psychological statements or reports which may be found in officers' personnel files. (*Ante,* at pp. 687-689.) Moreover, I dissent from the majority's apparent holding that appellant is entitled to unqualified reversal and a new trial no matter what is revealed by the discovery which will now occur. If that discovery reveals no relevant and admissible evidence bearing upon the voluntariness of his confession, a new trial would be unnecessary and wasteful. In that event, and subject to evaluation of appellant's other assertions of error, his judgment of conviction could and should be affirmed.

## I.

In the course of providing guidance for the trial court on retrial, the opinion undertakes to determine "whether discovery of statements of psychiatrists or psychologists contained in the officers' personnel files" is proper. Although the only two Court of Appeal decisions which have considered similar *Pitchess* (*Pitchess* v. *Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305]) requests for psychiatric records have found such discovery inappropriate (see *Lemelle* v. *Superior Court* (1978) 77 Cal.App.3d 148 [143 Cal.Rptr. 450]; *Arcelona* v. *Municipal Court* (1980) 113 Cal.App.3d 523 [169 Cal.Rptr. 877]), the majority proposes to adopt the reasoning and conclusion of Justice Tamura's dissent in *Lemelle,* directing the trial court to examine the psychiatric records of the four interrogating officers *in camera* and permitting disclosure if the court finds that the records are not protected by the psychotherapist-patient privilege by

virtue of the exception to the privilege embodied in Evidence Code section 1024.

The majority's analysis and conclusion raise a number of questions in my mind. First, although recognizing that the examination of psychiatric records involves privacy concerns of a different nature than other personnel records, the majority imposes no heightened "good cause" requirement for obtaining review of such records but appears to suggest that *in camera* examination is routinely appropriate so long as the examination is limited to the psychiatric records of the officers directly involved in the alleged police misconduct. Does this mean that *whenever* a criminal defendant claims that a police officer used excessive force, the officer's psychiatric records will be subject to *in camera* scrutiny by the trial court, even if there is no indication that the officer has ever engaged in violent conduct previously and there is nothing else to support the defendant's allegation? Before we sanction such broad intrusion into these private records, should not we first determine if the disclosure of the less-private personnel records provides a justification for probing into the officer's psychiatric background?

Second, I have some question whether the exception to the psychotherapist-patient privilege embodied in section 1024 was really intended to authorize the type of discovery that the majority permits. Section 1024 provides that "[t]here is no privilege under this article if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger." A number of authorities have recognized that this section was designed "to enable the therapist to initiate commitment proceedings and to testify in those proceedings when he determines the patient may present a danger to himself or others." (*Mavroudis* v. *Superior Court* (1980) 102 Cal.App.3d 594, 603 [162 Cal.Rptr. 724].)

It is difficult to see how this purpose fits into the *Pitchess* discovery context. The majority—quoting from Justice Tamura's dissent in *Lemelle* — states that "the peril to which the public is exposed by a police officer who is suffering from a mental or emotional condition which renders him violence prone or causes him to demonstrate racial bias is a danger of sufficient gravity to justify the invocation of the exception provided by Evidence Code section 1024." I would imagine, however, that in almost any psychiatric session a patient may reveal something about his mental or emotional condition that may suggest that he could be "violence prone" or a danger to others under some circumstances. Does not the majority's application of section 1024 suggest that a police officer's therapy sessions—whether included in police files or not—could be routinely scrutinized for disclosures

of such violent tendencies? And if this interpretation of section 1024 is valid, why would this exception not apply to psychiatric sessions of all persons generally, permitting civil plaintiffs in assault actions routinely to have a trial court examine *in camera* all psychiatric records of the defendant to determine if there are any revelations which demonstrate that he is violence prone?

I think there is a danger in adopting Justice Tamura's suggestion without a fuller consideration of the potential consequences.[1] At the very least we should insist upon some threshold showing before sanctioning wholesale invasion of privacy.

## II.

In discussing the question of the "consequence" of the trial court error in failing to grant discovery of the relevant personnel records, the majority characterizes the alternative disposition as "reversal" or "remand." It then suggests that "reversal" is the appropriate remedy, relying on *People* v. *Matos* (1979) 92 Cal.App.3d 862 [155 Cal.Rptr. 293] and *In re Valerie E.* (1975) 50 Cal.App.3d 213 [123 Cal.Rptr. 242, 86 A.L.R.3d 1163]. I believe the majority's terminology and its reliance on *Matos* and *Valerie E.* is somewhat misleading.

I would not dispute that the trial court's error in denying discovery does require the "reversal" of the judgment at this point. (Even in *People* v. *Coyer* (1983) 142 Cal.App.3d 839 [191 Cal.Rptr. 376]—where the Court of Appeal adopted what the majority terms "a remand procedure"—the

---

[1]In *Mavroudis* v. *Superior Court, supra,* 102 Cal.App.3d 594, the Court of Appeal considered the application of section 1024 in the context of a discovery request made by a plaintiff in a *Tarasoff* (*Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166]) action. There, the Court of Appeal set forth a rather elaborate procedure for the trial court to follow before authorizing disclosure: (1) The trial court must first examine the psychiatric records *in camera* to determine if the material reveals that the plaintiff was "readily identifiable" as a victim of the patient; if the plaintiff was not a readily identifiable victim, discovery is to be denied. (2) If the records reveal that the plaintiff was a readily identifiable victim, the court should decide whether the psychiatrist had determined, or reasonably should have determined, that the patient posed a serious danger of violence to the plaintiff. The Court of Appeal recognized that in making this determination, the trial court might have to resort to expert testimony, and it directed the trial court to appoint its own expert if it could not conclude, as a matter of law, that the psychiatrist should not have made such a determination. (See 102 Cal.App.3d at pp. 605-606.)

If the *Mavroudis* application of section 1024 were applied in the context of a *Pitchess* request, it seems clear that discovery would almost invariably be denied, because a criminal defendant seeking discovery is unlikely to be the kind of "readily identifiable" potential victim of the police officer to give rise to a *Tarasoff* duty to warn. At the least, *Mavroudis* provides some indication of the complex problems posed in attempting to use section 1024 as a basis for discovery, rather than as an authorization for disclosure by a psychiatrist.

court "reversed" the trial court judgment. (See 142 Cal.App.3d at p. 845.)) The real question, I believe, is what consequence should follow if it turns out after discovery is granted that the personnel files contain no evidence to support the defendant's claim. In that event, should the trial court be permitted to reinstate the original judgment, or will the defendant be entitled to an entire new trial on the basis of the same evidence that was before the trial court the first time? Although the majority opinion does not specifically address the issue in these terms, my impression is that the majority contemplates that defendant will be entitled to a new trial under any circumstances, even if it should turn out that the trial court's error in denying discovery could not have affected the judgment.

Neither *Matos* nor *Valerie E.*—the sole authorities on which the majority relies—supports this result. In the first place, there is no indication that the courts in either of those cases considered the alternatives of "reversal" or "remand" and consciously opted for "reversal"; thus, the cases cannot accurately be viewed as authority for the proposition that "reversal," rather than "remand," is the appropriate disposition. Furthermore, a close analysis of the dispositional language of both opinions reveals that neither disposition ruled out the possibility that the judgment might be reinstated if the discovery error—on full litigation—proved to be of no practical effect.[2]

Unlike *Matos* and *Valerie E.*, which did not explicitly address the question of dispositional alternatives, *Coyer* did directly focus on this matter and its discussion—relying on a recent decision of the Pennsylvania Supreme Court—provides, I think, a persuasive case for a remand in those cases in which it is impossible to determine whether the denial of discovery was prejudicial or not. After recognizing that our cases establish that the improper denial of discovery is not per se reversible, the *Coyer* court explained: "It is true that, on this record, application of traditional harmless

---

[2]In *Matos*, the dispositive portion of the opinion states in full: "The judgment is reversed with directions to grant a motion by defendant for discovery of the complaints made against [the two named officers] *and thereafter to proceed in a manner not inconsistent with this opinion.*" (Italics added.) (92 Cal.App.3d at p. 869.) Reinstatement of the judgment if discovery proved of no value to the defendant would in no way be inconsistent with the *Matos* opinion.

In *Valerie E.*, the Court of Appeal, after concluding that the trial court had erred in rejecting defendant's discovery motion on the ground that the defendant had not made an adequate showing of the materiality of the personnel records that were sought, noted that because the trial court had rejected defendant's motion on the threshold issue it had not passed on the People's claim of privilege under Evidence Code section 1040. In its dispositive order, the *Valerie E.* court stated: "The judgment is reversed *and the cause is remanded for a hearing on the applicability of the conditional privilege, if so raised.*" (50 Cal.App.3d at p. 220.) There is nothing in this language which suggests that the court intended to preclude the reinstatement of the judgment if—after full litigation of the privilege question— the trial court concluded that discovery should properly be denied.

error analysis would be 'speculative' as we do not know whether compliance with defendant's request would have revealed any [relevant information]. Nonetheless, a remedy exists. No material evidence has been destroyed. The information originally sought by appellant is still available to the prosecuting authorities. [Citation.] In *Com.* v. *Slaughter* (1978) 482 Pa. 538 [394 A.2d 453], the Supreme Court of Pennsylvania confronted an almost identical problem. There the trial court had committed error under *Davis* v. *Alaska,* [(1974)] 415 U.S. 308 [39 L.Ed.2d 347, 94 S.Ct. 1105], in denying defense counsel access to the juvenile records (if any) of a witness. Rather than reverse outright, *Slaughter* ordered the following disposition: '(The record does not even indicate whether or not Ragland, in fact, had a record of juvenile offenses, let alone whether that record, if it exists, would support appellant's claim of bias.) We therefore remand the matter to the trial court with instructions that appellant, through his counsel, be given access to Ragland's juvenile record. Counsel will then be able to argue to the trial court what, if any, use could have been made of that record had he been allowed to use it to cross-examine Ragland. If, in the court's opinion, its original refusal to allow defense counsel to cross-examine Ragland on the basis of this juvenile record prevented appellant from presenting to the jury evidence regarding Ragland's possible bias, or other information which would bring the case within the requirements of *Davis, supra,* it shall vacate the judgment of sentence and order a new trial. If, on the other hand, Ragland has no juvenile record, or if in the court's opinion, appellant has failed to assert any facts which would bring the case within the rationale of *Davis, supra,* it shall affirm its original order. Either party may then file an appropriate appeal.' " (142 Cal.App.3d at p. 844. See also *United States* v. *Gaston* (5th Cir. 1979) 608 F.2d 607, 614; *United States* v. *Disston* (7th Cir. 1978) 582 F.2d 1108, 1110-1112.)

I do not see why a similar disposition to that adopted in *Coyer* and *Slaughter* is not appropriate here. In my view, we will be creating an unfortunate precedent if we conclude that the improper denial of discovery requires a retrial regardless of what the grant of discovery would have disclosed. Such a disposition cannot help but provide defendants in future cases with a substantial incentive *not* to challenge the denial of discovery orders pretrial: after all, if they are successful in a pretrial writ and obtain discovery, the information may not prove all that helpful at trial, while if they forego pretrial writ review, they can obtain a reversal just by showing that the discovery might have been beneficial.

Such a disposition also runs counter to the constitutional command that no judgment be reversed in the absence of prejudice (Cal. Const., art. VI, § 13), and fails properly to take into account the very substantial costs and

inconvenience, particularly in a case of this age and magnitude, which will be occasioned by an unnecessary retrial.

Penal Code section 1260 provides an appropriate mechanism for determining the actual prejudice that was engendered by the improper denial of discovery. Unless other arguments of appellant were found to require unconditional reversal—a question which I do not reach—I would reverse the judgment conditionally and remand to the trial court with directions to grant the motion for discovery, enforce compliance therewith, and entertain a renewed motion to exclude the evidence. If no such motion is made within the time specified by the trial court, or if the court determines that no additional admissible evidence supporting the assertion of involuntariness has been obtained as a result of respondent's compliance with the discovery order the judgment should stand affirmed.

Kaus, J., and Lucas, J., concurred.

Respondent's petition for a rehearing was denied August 1, 1985. Kaus, J., Grodin, J., and Lucas, J., were of the opinion that the petition should be granted.